[No. 65863-3. En Banc.]
Argued March 24, 1998. Decided August 6, 1998.
THE CITY OF REDMOND, *Appellant*, v. CENTRAL PUGET SOUND GROWTH MANAGEMENT HEARINGS BOARD, ET AL., *Respondents*.

40

MADSEN, J., concurs in the result only; SANDERS, J., concurs by separate opinion.

*Ogden Murphy Wallace, P.L.L.C.*, by *James E. Haney*, for appellant.

*Christine O. Gregoire, Attorney General*, and *Marjorie T. Smitch, Assistant*; and *Bogle & Gates, P.L.L.C.*, by *Elaine L. Spencer*, for respondents.

TALMADGE, J. — This case requires us to apply the definition of "agricultural lands" set forth in the Growth Management Act (GMA), RCW 36.70A, to parcels located within the Urban Growth Area (UGA) of the City of Redmond (the City). The parcels had been zoned agricultural for decades prior to the GMA. The landowners, however, had not farmed the land for many years. The proper definition of the statutory term of art "agricultural lands" pits the Legislature's stated goal of maintaining and enhancing agricultural lands near urban areas against encroaching urbanization.

Because we do not believe the landowners' current or intended use of the land is conclusive under the GMA's definition of "agricultural lands," and given the significance afforded preservation of agricultural lands under the GMA and the nature of the land use planning process the GMA envisions, we overrule the Central Puget Sound Growth Management Hearings Board's (the Board) interpretation of the definition of "agricultural lands." However, because the City failed to have a transfer or purchase of development rights (TDR) program in place when it designated the subject "agricultural lands" under the GMA, the City's designation of the parcels as agricultural fails. We remand the case to the Board for further proceedings in light of this opinion.

## ISSUES

1. Is the owner's current or intended use of land a conclusive factor in determining if property is "agricultural land" under RCW 36.70A.030(2), which requires the property be "primarily devoted" to commercial agricultural use and have "long-term significance for agricultural production"?

2. As the subject parcels in this case are within the City's UGA, and RCW 36.70A.060(4) requires the City to enact "a program authorizing transfer or purchase of development rights" in order to designate lands within its

UGA as agricultural, did the City satisfy the statutory requirement?

## FACTS

The City, a suburban city located in the Sammamish Valley between Lake Washington and Lake Sammamish, has grown rapidly in recent decades and is Washington's 14th largest city. The Sammamish Valley is an area of great beauty. The Sammamish River meanders through the Valley, the soils of which are lush and fertile, and denominated "prime agricultural soils" by the U.S. Soil Conservation Service. King County's agricultural lands preservation effort in the 1970s resulted in the purchase of development rights in significant portions of the Valley's acreage. Urban growth, however, has encroached upon the Valley and the agricultural activities within it. At present, approximately 47 percent of the Valley is in urban/commercial use, 33 percent is agricultural, and about 20 percent of the land lies fallow.

The Growth Management Act of 1990 was designed to address many questions, such as the ones this case involves. As required by the GMA, the City issued its comprehensive plan on July 18, 1995. In its plan, the City designated the portion of the Sammamish Valley within City limits as agricultural land. This designation encompassed a 32-acre parcel owned by the Benaroya Shareholders Trust (Benaroya), and another 20-acre parcel owned by the Universal Holdings Ltd. Partnership II and Cosmos Development and Administration Corporation (collectively, Cosmos).[1]

Benaroya and Cosmos did not like the agricultural designation because both had purchased their land expect-

---

[1] The concurrence asserts the City engaged "in a massive downzone while limiting land not actually used for agriculture to an agricultural use, or no use at all." Concurrence at 59. This is erroneous. Nobody has alleged, and the Board has not found, that the City's comprehensive plan does not accommodate its GMA-mandated share of growth. Moreover, as the subject property has been zoned agricultural since 1967, it is untrue that the City effected a "downzone" of Benaroya's property.

ing to develop it for more intensive (and potentially more lucrative) uses. Benaroya acquired its land in 1969. At the time of acquisition, the land had been zoned agricultural for two years. It has been zoned agricultural ever since. Benaroya acquired this agricultural land "with the intention of developing it for industrial use." Clerk's Papers at 65.

The prior history of the Cosmos parcel is not set forth in the record. The Board noted "there is no mention in the record regarding the subject of whether the Cosmos property is presently or has been devoted to commercial agricultural production." Final Determination & Order at 1759. Cosmos acquired its 74 acres for a master-planned mixed-use development. The City designated the 20 acres of Cosmos's 74 acres lying in the Sammamish Valley floor as agricultural.

Both landowners petitioned the Board for review of the City's designation, and the Board consolidated the two petitions. Benaroya's petition related solely to the agricultural designation. Cosmos's petition related both to the agricultural designation and to a housing density designation that depended on the agricultural designation. Both also argued the City's designation was improper because the City did not have a TDR program in place at the time of the designation, as required by RCW 36.70A.060(4).

The Board found for Benaroya and Cosmos, holding the City's agricultural designation was not in compliance with the GMA because the properties had not been primarily devoted to commercial agricultural production, finding the owners' current or intended use to be conclusive. It also held the City was without authority to designate agricultural land within its UGA because it did not have a program in place for transfer or purchase of development rights. With respect to Cosmos's housing density issue, the Board held the Cosmos development would fall below the four dwelling unit per acre density required by the Board for urban development. The Board remanded the agricultural designations to the City with instructions to redesig-

nate the land "consistent with the Act," and with instructions for the City to "bring the average net density of the [Cosmos] property within urban densities." Clerk's Papers at 46.

The City appealed to the superior court under RCW 36.70A.300(5).[2] Without discussion, the superior court entered a judgment affirming the Board's decision on November 1, 1996. The City then appealed to the Court of Appeals, Division One, which certified the case to us. We accepted certification. RCW 2.06.030; RAP 4.3.

## ANALYSIS

■ RCW 36.70A.295(1) provides for judicial review of Board decisions in superior court. Appeals from final decisions of the superior court proceed as all other civil appeals. RCW 36.70A.295(3). We apply the standards of RCW 34.05 directly to the record before the agency, sitting in the same position as the superior court. *Tapper v. Employment Security Dep't*, 122 Wn.2d 397, 402, 858 P.2d 494 (1993). Under the judicial review statute of the Administrative Procedure Act, the "burden of demonstrating the invalidity of agency action is on the party asserting invalidity." RCW 34.05.570(1)(a). Thus, the burden was on the City. Because the City asserts the invalidity of an agency order resulting from an adjudicative proceeding, RCW 34.05.570(3) applies. That subsection sets forth nine standards for granting relief from the Board's decision, of which the City asserts three:

(d) The agency has erroneously interpreted or applied the law;

(e) The order is not supported by evidence that is substantial when viewed in light of the whole record before the court, which includes the agency record for judicial review, supplemented by any additional evidence received by the court under this chapter;

---

[2]RCW 36.70A.300(5) provides, "Any party aggrieved by a final decision of the hearings board may appeal the decision to superior court as provided in RCW 34.05.514 or 36.01.050 within thirty days of the final order of the board."

46

. . . .

(i) The order is arbitrary or capricious.

 In reviewing agency findings under RCW 34.05.570(3)(e), substantial evidence is "a sufficient quantity of evidence to persuade a fair-minded person of the truth or correctness of the order." *Callecod v. State Patrol*, 84 Wn. App. 663, 673, 929 P.2d 510, *review denied*, 132 Wn.2d 1004, 939 P.2d 215 (1997).

 With respect to issues of law under RCW 34.05.570(3)(d), we essentially review such questions de novo. We accord deference to an agency interpretation of the law where the agency has specialized expertise in dealing with such issues, but we are not bound by an agency's interpretation of a statute. As we stated in *Overton v. State Econ. Assistance Auth.*, 96 Wn.2d 552, 555, 637 P.2d 652 (1981):

> Where an administrative agency is charged with administering a special field of law and endowed with quasi-judicial functions because of its expertise in that field, the agency's construction of statutory words and phrases and legislative intent should be accorded substantial weight when undergoing judicial review. . . . We also recognize the countervailing principle that it is ultimately for the court to determine the purpose and meaning of statutes, even when the court's interpretation is contrary to that of the agency charged with carrying out the law.

"Concerning conclusions of state law this court is the final arbiter, and conclusions of state law entered by an administrative agency or court below are not binding on this court." *Leschi Improvement Council v. State Highway Comm'n*, 84 Wn.2d 271, 286, 525 P.2d 774, 804 P.2d 1 (1974).

 Finally, as to "arbitrary and capricious" agency action for purposes of RCW 34.05.570(3)(i), we mean " 'willful and unreasoning action, taken without regard to or consideration of the facts and circumstances surrounding

the action. Where there is room for two opinions, an action taken after due consideration is not arbitrary and capricious even though a reviewing court may believe it to be erroneous.' " *Kendall v. Douglas, Grant, Lincoln & Okanogan Counties Pub. Hosp. Dist. No. 6*, 118 Wn.2d 1, 14, 820 P.2d 497 (1991) (footnote omitted) (quoting *Abbenhaus v. City of Yakima*, 89 Wn.2d 855, 858, 576 P.2d 888 (1978)).

A. GMA Policy on Agricultural Land

In seeking to address the problem of growth management in our state, the Legislature paid particular attention to agricultural lands. One of the 13 planning goals of the GMA addresses natural resource industries: "Maintain and enhance natural resource-based industries, including productive timber, agricultural, and fisheries industries. Encourage the conservation of productive forest lands and productive agricultural lands, and discourage incompatible uses." RCW 36.70A.020(8). The purpose is to "assure the conservation" of these lands. RCW 36.70A.060(1). A more recent indication of the Legislature's concern for preserving agricultural lands is a new section the Legislature added in its 1997 amendments to the GMA, RCW 36.70A.177, which urges employment of "innovative zoning techniques" to conserve agricultural lands.

The GMA set aside special land it refers to as "natural resource lands," which include agricultural, forest, and mineral resource lands. "Natural resource lands are protected not for the sake of their ecological role but to ensure the viability of the resource-based industries that depend on them. Allowing conversion of resource lands to other uses or allowing incompatible uses nearby impairs the viability of the resource industry." Richard L. Settle & Charles G. Gavigan, *The Growth Management Revolution in Washington: Past, Present, and Future*, 16 U. PUGET SOUND L. REV. 867, 907 (1993).

The significance of agricultural land preservation in the GMA can be seen in the very timing of key actions mandated in the statute. RCW 36.70A.170(1)(a) requires designation of agricultural lands:

(1) On or before September 1, 1991, each county, and each city, shall designate where appropriate:

(a) Agricultural lands that are not already characterized by urban growth[3] and that have long-term significance for the commercial production of food or other agricultural products[.]

Thus, GMA required municipalities to designate agricultural lands for preservation even *before* those municipalities were obliged to declare their UGAs and adopt comprehensive plans in compliance with GMA. The "designation and interim protection of such areas [are] the first formal step in growth management implementation . . . to preclude urban growth area status for areas unsuited to urban development." *Id.* Also, requiring designation of natural resource lands at the outset of the GMA planning process prevents the irreversible loss of those lands to development and preserves land management options until completion of the comprehensive planning process. Gary Pivo, *Is the Growth Management Act Working? A Survey of Resource Lands and Critical Areas Development Regulations*, 16 U. PUGET SOUND L. REV. 1141, 1145 (1993).[4]

---

[3]"Urban growth" refers to

growth that makes intensive use of land for the location of buildings, structures, and impermeable surfaces to such a degree as to be incompatible with the primary use of such land for the production of food, other agricultural products, or fiber, or the extraction of mineral resources. When allowed to spread over wide areas, urban growth typically requires urban governmental services. "Characterized by urban growth" refers to land having urban growth located on it, or to land located in relationship to an area with urban growth on it as to be appropriate for urban growth.

RCW 36.70A.030(17).

[4]The concurrence suggests the majority opinion attributes "a false purpose to reserve land within urban growth areas (UGAs), such as the land here, as open space, under an agricultural pretext." Concurrence at 59. To the extent the concurrence implies the agricultural designation here was pretextual, the concurrence is wrong. The subject property was zoned agricultural for more than 30 years and no party nor the Board itself has indicated the agricultural designation was pretextual. To the extent the concurrence implies land within UGAs may not be zoned agricultural, it is also wrong. *See* RCW 36.70A.060(1).

## B. Definition of "Agricultural Lands" Under GMA

In accordance with the GMA mandate, the City's comprehensive plan designated the Benaroya parcel and the portion of the Cosmos parcel on the Sammamish Valley floor as agricultural lands. GMA defines "agricultural lands" as

> land primarily devoted to the commercial production of horticultural, viticultural, floricultural, dairy, apiary, vegetable, or animal products or of berries, grain, hay, straw, turf, seed, Christmas trees not subject to the excise tax imposed by RCW 84.33.100 through 84.33.140, finfish in upland hatcheries, or livestock, and that has long-term commercial significance for agricultural production.

RCW 36.70A.030(2). "Long-term commercial significance"

> includes the growing capacity, productivity, and soil composition of the land for long-term commercial production, in consideration with the land's proximity to population areas, and the possibility of more intense uses of the land.

RCW 36.70A.030(10). At issue in this case is the definition of "agricultural land." Benaroya and Cosmos argue the phrase "primarily devoted to" means in actual commercial production, and because their land has lain fallow for many years it cannot fit within the statutory definition. The City argues the phrase "primarily devoted to" means set apart for a specific purpose or use. The Board agreed with Benaroya and Cosmos.

■ The proper definition is purely a question of law, and the Court reviews it de novo under the "error of law" standard of RCW 34.05.570(3)(d). The Board held that in order for land to be designated as agricultural, it must be in actual agricultural use at the time of designation. Having found the Benaroya property to have lain fallow for 25 years, the Board concluded:

> The record shows that the Benaroya property has not been primarily devoted to commercial agricultural production for many years. *See* Finding of Fact No. 7. Although these lands are not already characterized by urban growth, in order to be designated as agricultural lands under the GMA, they must

both be primarily devoted to agricultural uses *and* have long-term significance for the commercial production of food or other agricultural products. The record does not reveal either.

Clerk's Papers at 17.

The Board based this conclusion on a statement it had made in an earlier case concerning the proper definition of "forest land." In that case, land owners petitioned the Board after Snohomish County had designated their land as forest land under the GMA. They argued their land was not productive forest land because they had no intention to use it as such. They wanted to develop it. In its decision in that case, the Board contrasted the statutory definition of forest lands with the statutory definition of agricultural lands:

> While RCW 36.70A.030(8) defines forest land as "land primarily useful for growing trees," RCW 36.70A.030(2) defines agricultural land as "land primarily devoted to the commercial production of horticultural . . . products." The latter terminology includes the landowner's intent: if the land is not currently being utilized for the commercial production of agricultural products, it cannot be designated agricultural land.

*Twin Falls, Inc. v. Snohomish County*, 1993 WL 839715, *22 (Wash. Cent. Puget Sound Growth Mgmt. Hrgs. Bd., Sept. 7, 1993). The Board relied on this statement of the definition of agricultural lands in the present case.[5] But the definition of agricultural land was not before the Board in the *Twin Falls* case; the Board engaged in no analysis, statutory or otherwise, in concluding the statutory definition of agricultural land includes the landowner's intent. Nor did the Board in this case engage in any analysis; instead, it simply relied on its conclusory dictum in *Twin Falls*.

---

[5]Interestingly, the Board appeared to be distressed at its own conclusion: "The Board is frankly troubled that, when viewed in the long term and given broad application, this site-specific legal conclusion has rather alarming practical implications." Clerk's Papers at 18 n.2.

The Board believes, and Benaroya and Cosmos argue, the legislative reaction to the *Twin Falls* decision supports its position: the Legislature changed the definition of "forest land" from "primarily useful for growing trees" to "primarily devoted to growing trees." LAWS OF 1994, ch. 307, § 2(8). The Legislature indicated the purpose of this change was "to clarify legislative intent regarding the designation of forest lands." LAWS OF 1994, ch. 307, § 1. Benaroya and Cosmos assert that by adopting the "devoted to" language from the definition of "agricultural land" and applying it to the definition of "forest land," the Legislature acquiesced in the Board's interpretation, reading landowner intent into the definition. Br. of Resp'ts at 25-26.

Even assuming the Legislature was reacting to the *Twin Falls* decision—nothing in the legislative history or record on appeal establishes it was—the new definition of "forest land" falls short of establishing current use of the land or landowner intent as a criterion for designation of "forest land." Benaroya and Cosmos fail to point out the amended definition includes four factors to be considered in designating "forest land," no one of which relates to current use or landowner intent:

> In determining whether forest land is primarily devoted to growing trees for long-term commercial timber production on land that can be economically and practically managed for such production, the following factors shall be considered: (a) The proximity of the land to urban, suburban, and rural settlements; (b) surrounding parcel size and the compatibility and intensity of adjacent and nearby land uses; (c) long-term local economic conditions that affect the ability to manage for timber production; and (d) the availability of public facilities and services conducive to conversion of forest land to other uses.

RCW 36.70A.030(8). Contrary to the Board's conclusion and Benaroya and Cosmos's assertions, the Legislature's *exclusion* of current use or landowner intent from this new list of factors is a strong argument for the proposition the Legislature *rejected Twin Falls'* conclusion that the phrase

"devoted to" encompasses current use or landowner intent.

Aside from what may or may not be inferred from the Legislature's change in the definition of "forest land," there are compelling reasons against concluding the Legislature intended current use or landowner intent to control the designation of natural resource lands under the GMA. First, if current use were a criterion, GMA comprehensive plans would not be plans at all, but mere inventories of current land use. The GMA goal of maintaining and enhancing natural resource lands would have no force; it would be subordinate to each individual landowner's current use of the land.[6] The Legislature intended the land use planning process of GMA to be area-wide in scope when it required development of specific plans for natural resource lands and, later, comprehensive plans.

Second, if landowner intent were the controlling factor, local jurisdictions would be powerless to preserve natural resource lands. Presumably, in the case of agricultural land, it will always be financially more lucrative to develop such land for uses more intense than agriculture. Although some owners of agricultural land may wish to preserve it as such for personal reasons, most, like Benaroya and Cosmos, will seek to develop their land to maximize their return. If the designation of such land as agricultural depends on the intent of the landowner as to how he or she wishes to use it, the GMA is powerless to prevent the loss of natural resource land. All a land speculator would have to do is buy agricultural land, take it out of production, and ask the controlling jurisdiction to amend its comprehensive plan to

---

[6]Although Benaroya was not using its parcel for agricultural purposes, the land retained its agricultural zoning. The record does not show Benaroya ever communicated an intent to the City to use the land for other purposes prior to the initiation of the present action. Indeed, in the absence of the GMA, in order for Benaroya to develop its agricultural land for industrial use, it would have to persuade the Redmond City Council to upzone the land from agricultural to the appropriate industrial designation. This would likely prove to be a frustrating endeavor. Benaroya certainly cannot claim any vested right to develop the land for any use other than agricultural. Thus, rather than hindering Benaroya's development of its land, the GMA's ambiguous definition of "agricultural land" provides a potential avenue for upzoning that might not have been otherwise available.

remove the "agricultural land" designation. Under the Board's interpretation, the controlling jurisdiction would have no choice but to do so, because the land is no longer being used for agricultural purposes.

A cardinal rule of statutory construction is to give effect to legislative intent. *Timberline Air Serv., Inc. v. Bell Helicopter-Textron, Inc.*, 125 Wn.2d 305, 312, 884 P.2d 920 (1994). A stated legislative intent of the GMA is to maintain and enhance agricultural land. RCW 36.70A.020(8). One cannot credibly maintain that interpreting the definition of "agricultural land" in a way that allows landowners to control its designation gives effect to the Legislature's intent to maintain, enhance, and conserve such land. Indeed, the Board's interpretation is likely to have exactly the opposite effect. We decline to interpret the GMA definition in a way that vitiates the stated intent of the statute.

We hold land is "devoted to" agricultural use under RCW 36.70A.030 if it is in an area where the land is actually used or capable of being used for agricultural production. Indeed, support for this definition of "devoted to" is found in dictionary treatment of the term. One of the primary meanings of "devote" is to "set apart or dedicate by a solemn or formal act." RANDOM HOUSE UNABRIDGED DICTIONARY 544 (2d ed. 1993). The land in this case was set apart for agricultural use by longstanding zoning. While the land use on the particular parcel and the owner's intended use for the land may be considered along with other factors in the determination of whether a parcel is in an area primarily devoted to commercial agricultural production, neither current use nor landowner intent of a particular parcel is conclusive for purposes of this element of the statutory definition.[7]

With regard to the proper definition of "agricultural

---

[7]The concurrence asserts the majority opinion's definition of "agricultural land" is dictum because we have decided the case on other grounds. While the concurrence's definition of what is dicta is one of many we have employed, we have also said "a deliberate expression of the court upon the meaning of the statute" should not be disregarded. *State v. Nikolich*, 137 Wash. 62, 66, 241 P. 664

land," we note the Legislature specifically provided for two elements to the definition of "agricultural lands" under GMA. The Board's decision focused on the element of whether the land was "primarily devoted to" agricultural purposes, and decided the petition solely on that element. Thus, it did not address the issue of "long-term commercial significance for agricultural production." Under the statutory definition of this second element, the Board must evaluate growing capacity, productivity, and soil composition, proximity to population areas, and the possibility of more intense uses of the land in question before the area could be designated "agricultural land."[8]

In addition to the statutory factors enumerated in RCW 36.70A.030(10), in WAC 365-190-050, the State Department of Community Trade and Economic Development, the agency charged by RCW 36.70A.170(2) with providing guidelines cities must consult in designating natural resource lands, provides 10 factors for "classifying agricultural lands of long-term significance for the production of food or other agricultural products." WAC 365-190-050 states:

(1) In classifying agricultural lands of long-term significance for the production of food or other agricultural products, counties and cities shall use the land-capability classification system

---

(1925); *accord Lee v. Sauvage*, 38 Wn. App. 699, 703, 689 P.2d 404 (1984). Here, the court took the case specifically to resolve the controversy over the statutory definition of "agricultural land." Both parties briefed and argued the question thoroughly before the Board, in the trial court, and before this court. The question was central to the case. As we said in *Savage v. Ash*, 86 Wash. 43, 46, 149 P. 325 (1915):

It may be that the case could have been rested on the first ground suggested in the opinion, namely, that the fraud alleged was not proven, but both questions were clearly in the case, and simply because the court decided both, does not necessarily mean that the one or the other is dictum.

*Accord Milwaukee Terminal Ry. Co. v. City of Seattle*, 86 Wash. 102, 105, 149 P. 644 (1915). It would be a waste of judicial resources and the resources of the litigants were we to leave the definition question unanswered now.

[8]In adopting this second element to the definition of agricultural lands under RCW 36.70A.030, the Legislature again made clear that owner intent or current use were not conclusive factors for purposes of the statutory definition. These additional statutory factors would *never* be relevant if owner intent controls on the first element of the definition.

of the United States Department of Agricultural Soil Conservation Service as defined in Agriculture Handbook No. 210. These eight classes are incorporated by the United States Department of Agriculture into map units described in published soil surveys. These categories incorporate consideration of the growing capacity, productivity and soil composition of the land. Counties and cities shall also consider the combined effects of proximity to population areas and the possibility of more intense uses of the land as indicated by:

(a) The availability of public facilities;

(b) Tax status;

(c) The availability of public services;

(d) Relationship or proximity to urban growth areas;

(e) Predominant parcel size;

(f) Land use settlement and their compatibility with agricultural practices;

(g) Intensity of nearby land uses;

(h) History of land development permits issued nearby;

(i) Land values under alternative uses; and

(j) Proximity of markets.

These factors, in addition to the statutory factors offer ready guidance in determining if land has "long-term significance" for agricultural production.

C. Transfer of Development Rights

██ ██ In adopting the definition of agricultural lands under GMA, the Legislature was also aware of the need for development within UGAs. For property like that at issue here, the Legislature balanced the need for urban growth within specified boundaries with agricultural land preservation. RCW 36.70A.060(4) contains the following legislative imperative: "Forest land and agricultural land located within urban growth areas shall not be designated by a county or city as forest land or agricultural land of long-

term commercial significance under RCW 36.70A.170 unless the city or county has enacted a program authorizing transfer or purchase of development rights."[9] The Board found the City had not enacted such a program at the time it made the agricultural designation of the Benaroya and Cosmos land, and thus held "the City was without authority to make any agricultural lands designations within a UGA prior to its enactment of a program authorizing a transfer or purchase of development rights pursuant to RCW 36.70A.060(4)." Clerk's Papers at 19. The City assigned error to this holding, but offers no specific argument as to what is defective about it.[10]

The obvious purpose of the statute, which requires the City to establish a program for the transfer or purchase development rights if the land is within the UGA, is to provide reimbursement to the owners of land when the uses of the land become frozen at a low level of intensity as a result of the City's designation. Here, the City made the agricultural designation without having a TDR program in effect, as the statute requires. As a result, the Board properly invalidated the designation.

---

[9]Neither the statute nor the implementing regulation defines "development rights," or how their transfers are to be administered. In general, land use programs incorporating TDRs

> designate some land as preservation areas, where little or no development is allowed, and other land as growth areas, suitable for high density residential or commercial development. The local land use regulatory authority grants TDRs to property owners in the preservation area, which they can sell or transfer to other tracts. . . . TDR programs can be a powerful tool to channel the process of development. Owners of land in the preservation zone, whose land would be of law value because of the development restrictions, benefit financially from TDRs.

James T.B. Tripp & Daniel J. Dudek, *Institutional Guidelines for Designing Successful Transferable Rights Programs*, 6 YALE J. ON REG. 369, 372-73 (1989) (footnote omitted).

[10]The City does allege it has enacted a transfer of development rights program and has redesignated the Sammamish Valley agricultural lands "urban recreation" pending the outcome of the appeal. The City makes no reference to the record on appeal to support its contention, so we have no way of knowing whether the assertions in its brief are true. Benaroya and Cosmos likewise assert, also without reference to the record, "The City has since designated all of the former 'agriculture' lands 'Urban Recreation,' thus presumably making them unavailable for transfer of development rights." Br. of Resp'ts at 44 n.12.

In summary, we uphold the Board's invalidation of the designation of the subject properties as agricultural because of the City's failure to enact a TDR program prior to the designation. RCW 36.70A.060(4).[11]

As a final issue in the case, Cosmos contends the improper designation of 20 acres of its 74 acre parcel as "agricultural" renders the City's calculation of housing density for its entire project erroneous, affecting whether or not the project is consistent with GMA-mandated urban densities. Both sides agree the density determination will abide a final decision on the designation of the subject land. Because we do not know the effect of the City's designation of the 20 acres of the Cosmos property as "urban recreation," we remand this issue to the Board for further consideration in light of this opinion.

## CONCLUSION

This is not a case where a local jurisdiction has capriciously slammed the door in the face of hapless developers by arbitrarily designating obviously urban land as agricultural. Neither Benaroya nor Cosmos suggest as much. Both knew the land was zoned agricultural at the time they bought it. Both hoped that at some future time, the City would agree to upzone the land for more intensive development. In the normal course, as economic conditions changed with the growth of the City, they might have reaped the rewards of developing their land. But the GMA changed the normal course. The GMA sought to control and regulate growth, and specifically emphasized the

[11]If the City has designated the properties "urban recreational," we note the Board found only that the City was required "to designate said parcels for an urban non-agricultural land use" and was not obliged to acquire the lands if it desired to set them aside for open space, in the event the agricultural designation was erroneous. Final Determination & Order at 1760. Neither Benaroya nor Cosmos assigned error to this aspect of the Board's decision and it is a verity for purposes of this appeal.

Moreover, this opinion does not foreclose the City from employing any procedures that may be available to it to seek a rehearing as to the agricultural designation of the subject lands once a TDR program is in place. *See, e.g.,* RCW 36.70A.215 (review and evaluation of comprehensive plan).

protection of natural resource lands, including agricultural land. The Legislature hoped to preserve agricultural land near our urban centers so that freshly grown food would be readily available to urban residents and the next generation could see food production and be disabused of the notion that food grows on supermarket shelves.

In light of a study that the soils of the Sammamish Valley displayed excellent suitability for agriculture, the City simply designated as "agricultural land" under the GMA land within its boundaries that was both currently zoned agricultural and suitable by soil type for agricultural uses.

The Board's interpretation of the GMA definition of "agricultural land" is wrong. Allowing current use or landowner intent to control the definition of "agricultural land" would frustrate the stated purpose of the GMA to maintain and enhance natural resource lands. If the Legislature wanted current use or landowner intent to control, it would have said so explicitly. It has not.

However, for agricultural lands within UGAs where more intensive growth was envisioned and encouraged, the GMA required some effort at compensation to owners for agricultural land preservation. Because the City did not have a TDR program in place when the designations were made, RCW 36.70A.060(4) invalidates the City's designation of the subject properties as agricultural lands. We remand this case to the Board for further proceedings consistent with this opinion.

DURHAM, C.J., and DOLLIVER, SMITH, GUY, JOHNSON, and ALEXANDER, JJ., concur.

MADSEN, J., concurs in the result.

SANDERS, J. (concurring) — I also agree with the decision of the Central Puget Sound Growth Management Hearings Board (GMHB) which invalidated the agricultural designation of the subject properties due to the City of Redmond's failure to enact a transfer of development rights (TDR)

program. However the majority's dicta corrupt the Legislature's definition of "agricultural land" incorporated within the Growth Management Act (GMA), taking a giant step toward rendering this legislation unworkable.[12]

The majority's conclusion effectively defeats the GMA by attributing a false purpose to reserve land within urban growth areas (UGAs), such as the land here, as open space, under an agricultural pretext. *See* Majority at 42. In-depth scholarly analysis of the Act discerns the intent of the GMA, and other similar acts, is to identify and separate urbanizable land from rural land and to designate areas (i.e., UGAs) as places where development is to be allowed and encouraged. Keith W. Dearborn & Ann M. Gygi, *Planner's Panacea or Pandora's Box: A Realistic Assessment of the Role of Urban Growth Areas in Achieving Growth Management Goals*, 16 U. Puget Sound L. Rev. 975, 976-77 (1993). The legislative intent is to concentrate public and private investment within the designated urban areas. *Id.* at 1006. This intent is realized by allowing someone who owns land within an urban growth area, not actually and productively used for agriculture, to devote it to increased urban use. Such reduces urban sprawl by efficiently allowing for increased development within the UGA. *See* RCW 36.70A.020(1) (Urban growth) and (2) (Reduce sprawl).

However in juxtaposition to the purposes of the GMA, Redmond did precisely the opposite: it curtailed the municipality's ability to accommodate urbanized growth by engaging in a massive downzone while limiting land not actually used for agriculture to an agricultural use, or no use at all.[13]

---

[12]The majority's definition, not being required, is dicta and therefore not binding in future cases. *See Burkhart v. Harrod*, 110 Wn.2d 381, 391, 755 P.2d 759 (1988) (Utter, J., concurring).

[13]The GMHB in its Final Decision and Order specifically found:

Petitioners cited to the City Planning Director's admonition to the Council, during its Plan review, that it was significantly reducing residential density city-wide while simultaneously increasing employment:

## THE QUESTION OF DEVOTION

Accordingly this agricultural zoning must be viewed in the context of the larger goal of the GMA to concentrate urban growth within urban growth boundaries. Given that our population must live somewhere, unchecked local efforts to discourage urban growth within urban areas defeat the GMA by making it unworkable.

Viewed in this light the Legislature has narrowly defined agricultural land:

"Agricultural land" means land primarily devoted to the commercial production of horticultural, viticultural, floricultural, dairy, apiary, vegetable, or animal products or of berries, grain, hay, straw, turf, seed, Christmas trees . . . finfish in upland hatcheries, or livestock, and that has long-term commercial significance for agricultural production.

RCW 36.70A.030(2).[14] That is, "agricultural land" has two attributes: (1) land primarily *devoted* to commercial agricultural production; and (2) land that has *long-term commercial significance* for continued agricultural production. The majority writes "land is 'devoted to' agricultural use

---

. . . every decision that's been made of almost two days of decisions has already reduced the overall housing capacity. We've already reduced the capacity of single family [R-4/8 to R-4/6]. I have no doubt that you'll do more of that tonight . . . and now we're reducing the capacity of multifamily. We've done it downtown and we're doing it . . . you're proposing this for Overlake. We don't want the rural area to change east of us. We don't want the rural area to change north of us. But we want to take all these jobs which raise—create tremendous demand for housing in Redmond. It just doesn't hold together as a plan.

*Benaroya v. City of Redmond*, No. 95-3-0072, at 1762 (GMHB 1996).

[14]The GMHB, in reading this language, had no trouble understanding it. Land is devoted to the listed agricultural activities when land is used for one or more of those purposes. *See Benaroya v. City of Redmond*, No. 95-3-0072, Final Decision & Order at 1757-59 (GMHB 1996); Majority at 44. As the majority correctly notes, questions as to the meaning of state law are ultimately our responsibility. Majority at 46; (quoting *Leschi Improvement Council v. State Highway Comm'n*, 84 Wn.2d 271, 286, 525 P.2d 774, 804 P.2d 1 (1974)). Nonetheless, we assume that the GMHB is entitled to heightened deference where, as here, the Board's construction of the statute is within its field of expertise. *Green River Community College v. Higher Educ. Personnel Bd.*, 107 Wn.2d 427, 438, 730 P.2d 653 (1986).

under RCW 36.70A.030 if it is in an area where the land is actually used *or* capable of being used for agricultural production." Majority at 53 (emphasis added). Thus, according to the majority, it is possible that land upon which a crop has not grown for 25 years may nevertheless be land "devoted to" agriculture. This conclusion is contrary to the plain meaning of the statutory text and leads to an absurd result.

The starting point of all statutory construction must be the language of the statute itself. The meaning of the statute must be derived from the language if the language is unambiguous. *Harmon v. Department of Soc. & Health Servs.*, 134 Wn.2d 523, 530, 951 P.2d 770 (1998); *Freitag v. McGhie*, 133 Wn.2d 816, 825-26, 947 P.2d 1186 (1997) (Sanders, J., dissenting). Words must be given their ordinary meaning. *Department of Revenue v. Hoppe*, 82 Wn.2d 549, 552, 512 P.2d 1094 (1973). We are proscribed from making an absurd interpretation of a statute to reach a result, no matter how much the majority may desire to do so. *Cooper's Mobile Homes, Inc. v. Simmons*, 94 Wn.2d 321, 326, 617 P.2d 415 (1980).

Furthermore, this court must give deference to the Growth Management Hearings Board's interpretation of the GMA. "It is well settled that deference is appropriate where an administrative agency's construction of statutes is within the agency's field of expertise." *Chrysler Motors Corp. v. Flowers*, 116 Wn.2d 208, 216, 803 P.2d 314 (1991); *Green River Community College v. Higher Educ. Personnel Bd.*, 107 Wn.2d 427, 438, 730 P.2d 653 (1986).

But the majority prefers an obscure dictionary definition of the word "devote" ("to 'set apart or dedicate by a solemn or formal act' ") and applies it by claiming land which has lain fallow for 25 years is land nonetheless "devoted to" agriculture. Majority at 53 (quoting Random House Unabridged Dictionary 544 (2d ed. 1993)).

While this definition, in the abstract, may be consistent with the word when used in other contexts, I am at a loss to think of a single common or literary usage of the phrase

"devoted to" that fits the majority's usage. The OXFORD ENGLISH DICTIONARY (OXFORD) devotes five full columns to the word "devote" and its various derivations, yet not one of its many quotations, from such as the Bible, Shakespeare, J.T. Fowler, and the correspondence of laymen, fits within the majority's definition. III OXFORD 293-95 (1933). Specifically, OXFORD offers seven examples of the use of the word "devote" within the context of the definition advocated by the majority. But not a single one supports the majority's application; rather each concerns *actual* gifts or declarations of love and lifelong devotion, *id.* at 294—hardly the usage employed by the majority.

Consider the result of the majority's reasoning. Actually doing or not doing the activity for which one may have "devoted" his time or his land, by the majority's definition, is not determinative.[15] Rather, it is only setting aside, not doing or using, that truly matters.

We also assume that the Legislature is aware of the definitions that this court has attached to words and phrases. *Price v. Kitsap Transit*, 125 Wn.2d 456, 463-64, 886 P.2d 556 (1994). That which has been "devoted to" a specific use has often been addressed by this court. We have repeatedly held whether land is "devoted to" a particular use or not is determined by "the use to which the property is applied . . ." *State ex rel. Milwaukee Terminal Ry. Co. v. Superior Court*, 54 Wash. 365, 375, 103 P. 469 (1909). It is use, not "zoning," that has consistently been the court's focus to determine whether or not land has been "devoted to" a specific use. *See, e.g., Albee v. Town of Yarrow Point*, 74 Wn.2d 453, 454-58, 445 P.2d 340 (1968) (street widened to allow access by traffic to Lake Washington is devoted to public use); *Anderson v. Port of Seattle*, 49 Wn.2d 528, 530, 304 P.2d 705 (1956) (municipal airport operated by Port of Seattle is property devoted to public use); *State ex rel. Eastvold v. Superior Court*, 44 Wn.2d

---

[15]In this way the majority would avoid the "evil" of considering the intent or judgment of the private land owner as to whether agriculture is the best and highest use of his property, implicitly assuming that the free market is less able to efficiently allocate the use of real property than the political process.

607, 608, 269 P.2d 560 (1954) (state highway operated by a municipal corporation is a property devoted to public use); *State ex rel. York v. Board of Comm'rs*, 28 Wn.2d 891, 897, 184 P.2d 577, 172 A.L.R. 1001 (1947) (a highway is land devoted to public use).

We are also commanded to interpret statutes in a manner that avoids illogical or absurd results. *Blondheim v. State*, 84 Wn.2d 874, 879, 529 P.2d 1096 (1975).

But the majority's circular reasoning achieves exactly the absurd outcome we are constrained to avoid. According to the majority one of the key questions a city should ask before determining whether land is to be designated agricultural under the GMA is: "Have we (the City) already zoned the land agricultural?" If it has, so reasons the majority, it satisfies the "devotion" test. However, if the land were not zoned agricultural, why else would anyone seek to challenge the determination as inconsistent with the statute? A self-fulfilling prophecy.

The majority also defines "devoted to" to mean land "actually used *or* capable of being used for agricultural production." Majority at 53 (emphasis added). This definition is contrary to the Legislature's. The Legislature joins "primarily devoted" *and* "long term commercial significance" whereas the majority virtually eliminates the first in favor of the second as land incapable of agricultural use cannot, by definition, be actually used for agricultural production. All that is left is land capable of being used for agriculture, which can't refer to the actual use.[16]

Therefore, by the majority's definition, what the GMA tests is *only* whether or not the alleged agricultural land has "long-term commercial significance," notwithstanding the statutory requirement that such land have *both* devotion *and* long-term capability. "It is of course the rule that the courts are obliged to interpret a statute, if possible, so that no portion of it is superfluous, void, or insignificant."

---

[16]Which is, effectively, all land—even a parking lot can be torn up, the ground underneath exposed, and a tomato plant planted.

*Snow's Mobile Homes, Inc. v. Morgan*, 80 Wn.2d 283, 288, 494 P.2d 216 (1972) (citations omitted).

Giving preference to a city's zoning designation is also illogical in the context of the statutory definition. Agricultural land, by the statute's definition, is land "primarily devoted" to the commercial production of a variety of vegetable and animal products. RCW 36.70A.030(2). However, before land can be "primarily devoted" to the commercial production of such products it has to be agriculturally zoned; although just because it is so zoned does not mean it will be so used. The Legislature has codified an extensive list of possible uses within agriculturally zoned land to instruct Growth Management Hearing Boards, and this court, on the criteria which must apply to determine if land has been "devoted" to agriculture. Again, the majority's reasoning is circular.

Finally, I am at a loss to understand how a zoning designation can be an indicator of land being "primarily devoted to" commercial agricultural production when in fact there is no commercial agricultural production and, by free market standards, will not be.

## THE QUESTION OF INTENT

As the statute is clear and unambiguous, there is no need to engage in the always-dangerous practice of divining the Legislature's intent.[17] Even if we were to accept (which I do not) that the Legislature's intent *did not require* the outcome of its clear words, this court would nonetheless be bound by the statute. *Hoppe*, 82 Wn.2d at 552 ("Words of a statute . . . must be given their usual and ordinary meaning. This is true regardless of the policy of enacting the law or the seeming confusion that may follow its enforce-

---

[17]As then Professor Easterbrook noted, "[b]ecause legislatures comprise many members, they do not have 'intents' or 'designs,' hidden yet discoverable. Each member may or may not have a design. The body as a whole, however, has only outcomes." Frank H. Easterbrook, *Statutes' Domains* 50 U. CHI. L. REV. 533, 547 (1983). *See also North Coast Air Servs., Ltd. v. Grumman Corp.*, 111 Wn.2d 315, 327, 759 P.2d 405(1988) ("What motivated the actual language of the statute is too speculative to be of assistance in interpreting the words enacted into law.").

ment.") (citations omitted); *State v. Miller*, 72 Wash. 154, 158, 129 P. 1100 (1913) ("It is a very well-settled rule that so long as the language used is unambiguous a departure from its natural meaning is not justified by any consideration of its consequences, or of public policy. . . .") (quoting 36 Cyc. 1114).

However, let us for a moment humor the majority by somehow assuming the statute's meaning is not plain—statutory definitions and all—therefore forcing us to interpret the statute in a manner that gives effect to the Legislature's intent not fully expressed by the words actually employed. *See, e.g., State v. Coffey*, 77 Wn.2d 630, 637, 465 P.2d 665 (1970).[18]

The majority writes, "[a] stated legislative intent of the GMA is to maintain and enhance agricultural land." Majority at 53 (citing RCW 36.70A.020(8)). The actual language of the statute is subtly, but perhaps importantly, different. Section .020 outlines the "goals" of the act. Among these goals is to "Maintain and enhance . . . *productive* . . . agricultural . . . industries [and e]ncourage the conservation of . . . *productive* agricultural lands . . . ." RCW 36.70A.020(8) (emphasis added).

Among the other goals of the GMA, not cited by the majority, are those that: "[e]ncourage development in urban areas . . . .", RCW 36.70A.020(1); protect the property rights of landowners, RCW 36.70A.020(6); and "[e]ncourage the involvement of citizens in the planning process . . . .," RCW 36.70A.020(11). All of *these* stated intents of the GMA are, of course, best served by the conclusion reached by the GMHB, which is to encourage growth within urban growth boundaries, not defeat it.

If the Act's goals require us to describe the language as "ambiguous," we must apply the maxim which requires us

---

[18]Although the majority never actually states that the wording of the definition of "devoted to" is ambiguous, it is implicit in the majority's policy-driven analysis of the act and its examination of intent that preceded its definition. *See* Majority at 51-53. Such a digression would not, of course, be necessary, or even appropriate, absent some ambiguity in the statute. *Harmon*, 134 Wn.2d at 530.

to apply zoning regulations with more than one reasonable construction in the manner least restrictive to the landowner. 3A NORMAN J. SINGER, STATUTES AND STATUTORY CONSTRUCTION § 75.07 (5th ed. 1992); *Mall, Inc. v. City of Seattle*, 108 Wn.2d 369, 378, 739 P.2d 668 (1987). This, of course, is decidedly neither the interpretation the majority selects, nor the one which avoids putting the Act's goals in conflict with one another.

A further indication that "devoted to" means current use is found in *Twin Falls* where the GMHB held "devoted to" means current use. *Twin Falls, Inc. v. Snohomish County*, 1993 WL 839715 (Wash. Cent. Puget Sound Growth Mgmt Hr'gs Bd., Sept. 7, 1993). After *Twin Falls* the Legislature amended the GMA in 1994, and specifically the section defining agricultural land, yet it did not amend the phrase "devoted to." The Legislature is presumed to be aware of how a statute has been construed. *Hazel v. Van Beek*, 135 Wn.2d 45, 58, 954 P.2d 1301, 1307 (1998). Reenactment of a statute without material change after it has been construed by an authority entrusted with its interpretation implies acquiescence by the Legislature to the construction given the statute. *Longview Fibre Co. v. Cowlitz County*, 114 Wn.2d 691, 698, 790 P.2d 149 (1990).

## CONCLUSION

I agree with the majority that land cannot be designated "agricultural" absent an in-place TDR. However, even if such a program were enacted I would affirm the GMHB's logical, consistent, and clear reading of the GMA, to hold land which is not in actual productive agricultural use is not "devoted to" such use.