256 P.3d 1259 (2011)
162 Wn. App. 902
STATE of Washington DEPARTMENT OF SOCIAL AND HEALTH SERVICES, Respondent,
v.
Raymond NIX, Jr., Appellant.
No. 40700-1-II.
Court of Appeals of Washington, Division 2.
August 3, 2011.
*1261 Todd Harris Carlisle, Tacoma, WA, for Appellant.
Jonathon Bashford, Office of the Attorney General, Olympia, WA, Peter J. Helmberger, Office of the Attorney General, Tacoma, WA, for Respondent.
David R. Carlson, Disability Rights Washington, Seattle, WA, for Amicus Curiae on behalf of Disability Rights Washington.
WORSWICK, A.C.J.
¶ 1 Raymond Nix Jr. appeals from a final administrative order denying him Washington State Department of Social and Health Services (Department) Division of Developmental Disabilities (DDD) services. He contends that his mild mental retardation is a condition that qualifies him for services. Nix specifically argues that (1) the Department's interpretation of relevant statutes and administrative rules is contrary to law, (2) the Department's decision denying him services was arbitrary and capricious, (3) the Department has imposed a new substantive restriction without employing the requisite rulemaking process, (4) the Department is violating the federal Medicaid diagnosis discrimination prohibition, and (5) the constitutional equal protection clause entitles him to services. Holding that Nix has not met his burden of demonstrating the invalidity of the agency decision, and finding no violation of federal law or constitutional principles, we affirm.

FACTS
¶ 2 Nix, born in 1975, experienced a particularly arduous childhood. In 1984, his parents' parental rights were terminated and during that same year, Nix underwent a psychiatric evaluation due to allegations that a family member had sexually abused him. The reviewing psychiatrist ultimately determined that Nix was seriously damaged by child abuse and neglect.
¶ 3 For much of his early life, Nix lived in Alaska. Starting in 1985, he had been eligible for special education services there based on a "mild mental retardation" finding.[1] Administrative Record (AR) at 20. In May 1988, Nix took an IQ test and scored 69. In 1990, Nix left Alaska and lived in the State of Washington, under the supervision and care of the Department. At that time, he received DDD services. In April 1990, when *1262 Nix was 15 years old, the Federal Way School District completed a school assessment and determined that he was mildly mentally retarded. Around this same time, Nix started drinking alcohol heavily.
¶ 4 Nix took another IQ test in August 1991 and scored 74, which falls in the "Borderline Range" of intellectual functioning. AR at 22. A psychologist evaluating him at the time also determined that his behavior was consistent with fetal alcohol syndrome (FAS); but no FAS diagnosis was made. Then in November 1993, Nix scored 71 on another IQ test. Around that same time, Nix started living in supported housing administered by the Arc of King County. Nix took another IQ test when he was 22 years oldscoring 72.
¶ 5 In August 2005, when Nix was 29 years old, his DDD case manager referred him to another psychiatrist, Dr. Natalie Brown, for a psychosexual evaluation following a child sexual abuse incident where he had been the alleged perpetrator. Brown reviewed Nix's records and IQ test scores and opined as follows:
Most of these earlier test results placed [Nix] in the borderline range of intellectual functioning. While there is some variability in these earlier scores, which may have been affected by test administration differences as well as by [Nix's] variable performance skills between age 12 and 23, it appears that his intellectual functioning is diminishing as he grows older. It is strongly suspected this cognitive deterioration is due to chronic alcohol abuse.
AR at 24. Dr. Brown also conducted an evaluation to determine whether it would be appropriate to place him on a Community Protection Waiver (CAP).[2] Nix was ultimately found eligible for the CAP. As a result, he received help with living skills, 24-hour supervision, and a job through a vendor that provided his supported living placement.
¶ 6 Also in 2005, the Department took steps to modify, clarify, and establish a series of administrative rules surrounding the DDD services program. The Department listed the following reasons:
The purpose of these rules is to clarify the entire application and eligibility determination process used by [DDD]. This new chapter:
 Describes how to apply for a determination of a developmental disability;
 Defines the conditions required to be considered a person with a developmental disability, defines how these conditions may meet substantial limitations to adaptive functioning and the defines [sic] the evidence required to substantiate adaptive functioning limitations;
 Defines how the age of an individual affects the eligibility determination process;
 Describes the Inventory for Client and Agency Planning (ICAP);
 Defines the expiration of eligibility, reviews and reapplication; and
 Describes an individual's rights as a client of DDD.
Clerk's Papers (CP) WAC Rulemaking File (RMF) at 33. Several administrative rule provisions enacted in 2005 aligned with former RCW 71A.10.020(3) (1998).[3] These provisions included WAC 388-823-0040, WAC 388-823-0700, and WAC 388-823-0200, among others. Under former RCW 71A.10.020(3),
"Developmental disability" means a disability attributable to mental retardation, cerebral palsy, epilepsy, autism, or another neurological or other condition of an individual found by the secretary to be closely related to mental retardation or to require treatment similar to that required for individuals with mental retardation, which disability originates before the individual attains age eighteen, which has continued or *1263 can be expected to continue indefinitely, and which constitutes a substantial handicap to the individual.
WAC 388-823-0040 defines a "developmental disability" as follows:
(1) A developmental disability is defined in RCW 71A.10.020(3) and must meet all of the following requirements. The developmental disability must currently:
(a) Be attributable to mental retardation, cerebral palsy, epilepsy, autism, or another neurological or other condition found by DDD to be closely related to mental retardation or requiring treatment similar to that required for individuals with mental retardation;
(b) Originate prior to age eighteen;
(c) Be expected to continue indefinitely; and
(d) Result in substantial limitations to an individual's adaptive functioning.
(2) In addition to the requirements listed in (1) above, you must meet the other requirements contained in this chapter.
WAC 388-823-0700 describes the ways in which an individual meets the definition for an "other condition" similar to mental retardation:
(1) You have a diagnosis of a condition or disorder that by definition results in both intellectual and adaptive skills deficits; and
(a) The diagnosis must be made by a licensed physician or licensed psychologist;
(b) The diagnosis must be due to a neurological condition, central nervous system disorder involving the brain or spinal column, or chromosomal disorder;
(c) The diagnosis or condition is not attributable to or is itself a mental illness, or emotional, social or behavior disorder;
(d) The condition must have originated before age eighteen; and
(e) The condition must be expected to continue indefinitely.
And WAC 388-823-0200 outlines what evidence is necessary to substantiate a "mental retardation" condition:
Evidence that you have an eligible condition under "mental retardation" requires a diagnosis of mental retardation by a licensed psychologist, or a finding of mental retardation by a certified school psychologist.. . .
(1) This diagnosis is based on documentation of a lifelong condition originating before age eighteen.
(2) The condition results in significantly below average intellectual and adaptive skills functioning that will not improve with treatment, instruction or skill acquisition.
(3) A diagnosis or finding of mental retardation by the examining psychologist must include an evaluation of adaptive functioning that includes the use of a standardized adaptive behavior scale indicating adaptive functioning that is more than two standard deviations below the mean, in at least two of the following areas: Communication, self care, home living, social/interpersonal skills, use of community resources, self direction, functional academic skills, work, leisure, health, and safety.
¶ 7 Also as part of the rulemaking process, the Department issued a "Concise Explanatory Statement" (CES), as required under RCW 34.05.325. The CES must (1) identify the agency's reasons for adopting the rule, (2) describe the differences between the text of the proposed rule as published in the register and the text of the rule as adopted, and (3) summarize all comments received regarding the proposed rule and respond thereto. RCW 34.05.325(6). The CES stated:
An individual may . . . be diagnosed with mild mental retardation under DSM-IV criteria, but not meet the eligibility criteria under [the mental retardation rules]. However, that individual could still be eligible under "other condition", which by statute does not use IQ as the sole determinant.
RMF at 318.
¶ 8 Sometime after 2005, Nix withdrew from the CAP because his parents needed his help. This arrangement was not successful, however, and he requested to be put back on the CAP in early 2008. In light of this request, DDD reviewed Nix's service eligibility. *1264 Kay Stotesbery, an eligibility specialist with DDD, conducted the review. Stotesbery determined that Nix did not meet the definition of a person with a mental retardation disability because his IQ score consistently placed him in the borderline range of intellectual functioning, which was too high to qualify.[4] Stotesbery then considered whether Nix was eligible for DDD services based on a developmental disability that is an "other condition" closely related to mental retardation. Stotesbery concluded that Nix was not eligible under this criterion either.
¶ 9 After Nix was denied DDD services, he requested an administrative review. An administrative law judge affirmed the denial. Nix then appealed this decision to the Department's Board of Appeals, which affirmed the decision of the DDD and upheld its denial of services. The Board of Appeals affirmed on two bases: first, that Nix's mental retardation diagnosis does not qualify him for DDD services because his IQ score from the test administered closest to his eighteenth birthday exceeded 69, and second, because his diagnosis did not meet the criteria for an "other condition similar to mental retardation." AR at 29-30.
¶ 10 Nix then petitioned for judicial review in the superior court. The superior court affirmed the Department's final order on the grounds that "[a]n individual whose sole relevant diagnosis is mental retardation can only be eligible for DDD services if that diagnosis meets the requirements of the mental retardation rules." CP at 151 (internal quotation marks omitted). Nix now appeals.

ANALYSIS

Standard of Review
¶ 11 The Administrative Procedure Act (APA), chapter 34.05 RCW, governs our review of the Board's denial of developmental disability services to Nix. Utter v. State, Dep't of Soc. & Health Servs., 140 Wash.App. 293, 299, 165 P.3d 399 (2007). "`We apply the [APA] standards directly to the [agency] record, sitting in the same position as the superior court.'" Utter, 140 Wash.App. at 299, 165 P.3d 399 (quoting City of Redmond v. Cent. Puget Sound Growth Mgmt. Hearings Bd., 136 Wash.2d 38, 45, 959 P.2d 1091 (1998)).
¶ 12 We give substantial weight to an agency's interpretation of its own eligibility criteria for developmental disability services, as well as considerable deference to the agency's expertise and interpretation of its own rules. D.W. Close Co., Inc. v. Wash. State Dep't of Labor & Indus., 143 Wash. App. 118, 128-129, 177 P.3d 143 (2008); See Ballinger v. Dep't of Soc. & Health Servs., 104 Wash.2d 323, 336, 705 P.2d 249 (1985). Under the APA, the challenging party, Nix, bears the burden of demonstrating the invalidity of the agency decision. RCW 34.05.570(1)(a).

DDD Eligibility
¶ 13 Nix first contends that the Department's claimthat his mild mental retardation cannot be a qualifying condition for DDD eligibility services under its "other condition similar to mental retardation" rules violates the plain meaning of Washington's Developmental Disabilities Act.[5] Br. of Appellant at 16. He argues that as an individual with mild mental retardation, he is entitled to services as an "other condition" similar to mental retardation. This presents a question of statutory interpretation that we review de novo. Campbell v. Dep't of Soc. & Health Servs., 150 Wash.2d 881, 894, 83 P.3d 999 (2004).
¶ 14 In order to qualify for services, an individual must demonstrate an actual "neurological or other condition" that is either "closely related to mental retardation" or requires "treatment similar to [the treatment] required for individuals with mental retardation." Former RCW 71A.10.020(3)(1998); Slayton v. Dep't of Soc. & Health Servs., 159 Wash.App. 121, 130-31, *1265 244 P.3d 997 (2010). Any individual must have a "recognizable `condition'" before treatment can be considered. Slayton, 159 Wash.App. at 130, 244 P.3d 997.
¶ 15 In this case, Nix has failed to demonstrate another "recognizable condition" entitling him to services. As the Department points out, "mild mental retardation" is still "mental retardation." "Mild" simply qualifies the extent and severity of the mental retardation. RMF at 318. And because Nix did not meet the IQ threshold for this condition when he was under the age of 18, he does not qualify for services under WAC 388-823-0700. Because Nix has failed to demonstrate that he meets the requirements for services, his argument here fails.

Absence of Formal Rulemaking Procedures
¶ 16 Nix next contends that the Department's claimthat his mild mental retardation may not be a qualifying diagnosis for DDD services eligibility under its "other condition similar to mental retardation" rules contradicts its CES, and is therefore arbitrary and capricious. Br. of Appellant at 20. A court is authorized to reverse an agency order if the order is arbitrary and capricious. RCW 34.05.570(3)(i). An arbitrary or capricious action is a willful and unreasonable action made without consideration and without regard for the facts and circumstances. Pierce County Sheriff v. Civil Serv. Comm'n, 98 Wash.2d 690, 695, 658 P.2d 648 (1983).
¶ 17 Nix essentially argues here that the Department should be bound by its CES statement made as part of the rulemaking process which suggested that an individual with mild mental retardation could still be eligible under the "other condition" criterion. But as the Department points out, these statements do not carry the same weight as the rules themselves. RCW 34.05.230(1); Wash. Educ. Ass'n v. Wash. State Pub. Disclosure Comm'n, 150 Wash.2d 612, 619, 80 P.3d 608 (2003). Additionally, the Department is not precluded from changing its interpretation of its own rule. Lockheed Shipbuilding Co. v. State of Wash., Dep't of Labor & Indus., 56 Wash.App. 421, 430, 783 P.2d 1119 (1989). Based on this, Nix has not shown an arbitrary and capricious Department decision here. Thus, his argument fails.

Improper Substantive Restriction
¶ 18 Nix further contends that the Department's claimthat mild mental retardation may not be a DDD-qualifying "condition similar to mental retardation"is an invalid, unpromulgated, substantive restriction on DDD services eligibility. Br. of Appellant at 23. Under RCW 34.05.570(2)(c), a rule adopted without compliance with statutory rulemaking procedures is invalid. RCW 34.05.010(16) defines a rule as "any agency order, directive, or regulation of general applicability. . . which establishes, alters or revokes any qualification or requirement relating to the enjoyment of services or privileges conferred by law[.]"
¶ 19 Nix argues that the Department's decision to interpret the relevant statutory language and its administrative rules differently is a de facto rulemaking change without the requisite process. But as the Department points out, it is free to interpret its rules. Changing its interpretation, which would of course alter the outcome in many circumstances, is not an impermissible rulemaking change. Lockheed, 56 Wash.App. at 430, 783 P.2d 1119. And regardless, the Department conducted a proper, formal administrative rulemaking process in 2005, which provides the requisite authority for DDD's denial of services to Nix in this case. Nix has failed to demonstrate that the Department's actions here were improper. Thus, Nix's argument on this point fails.

Medicaid Discrimination Prohibition
¶ 20 Nix also contends that the Department's claimthat his mild mental retardation cannot be a qualifying condition for DDD services eligibilityviolates the federal Medicaid diagnosis discrimination prohibition.[6] 42 C.F.R. § 440.230(c) (2011) provides *1266 that the "Medicaid agency may not arbitrarily deny or reduce the amount, duration, or scope of a required service under §§ 440.210 and 440.220 to an otherwise eligible recipient solely because of the diagnosis, type of illness, or condition." See also 42 U.S.C. § 1396a (2011) (outlining requirements for state medical assistance plans).
¶ 21 Nix directs us to White v. Beal, 555 F.2d 1146 (3rd Cir.1977), to support his argument. In White, the court addressed the propriety of an administrative rule authorizing Medicaid prescription eyeglass coverage for certain eye diseases but not others with nearly identical symptoms. White, 555 F.2d at 1152. There the court struck down the rule and held that it was discriminatory and thus violated Medicaid law. White, 555 F.2d at 1151-52.
¶ 22 Nix ultimately argues that the termination of his DDD services eligibility has denied him access to Medicaid-funded community protection services. Washington's community protection program provides "an array of services specifically designed to support persons who meet the definition of an `individual with community protection issues[.]'"[7] WAC 388-831-0020(1). Community protection services "are designed to assist program participants to live safely and successfully in the community while minimizing the risk to public safety." WAC 388-831-0020(2). Services provided under this program include behavior management and consultation, community transition, environmental accessibility adaptations, occupational therapy, physical therapy, sexual deviancy evaluations, skilled nursing, specialized medical equipment and supplies, specialized psychiatric services, speech and language services, transportation, and mental health stabilization services. WAC 388-845-0220.
¶ 23 Under 42 C.F.R. § 440.230(c), this issue turns on whether community protection is a required service under §§ 440.210 and 440.220.[8] Comprehensive community services are not required services. 42 C.F.R. §§ 440.10-440.50; § 440.70. And as the Department points out, the lack of a required service is "fatal" to a diagnosis discrimination claim. See Rodriguez v. City of New York, 197 F.3d 611, 617 (2nd Cir.1999). Thus, Nix's argument fails.

Equal Protection
¶ 24 Lastly, Nix contends that the Department's claimthat his mild mental retardation cannot be a qualifying condition for DDD services eligibility under the "other condition similar to mental retardation" rulesviolates Nix's constitutional right to equal protection. He argues that there was no rational basis for the Department's termination of his DDD services eligibility and no legitimate state interest in denying mildly mentally retarded applicants access to DDD services, while providing those same services to other similarly situated applicants.
¶ 25 The equal protection clause of the Fourteenth Amendment provides that *1267 no State shall" `deny to any person within its jurisdiction the equal protection of the laws,' which is essentially a direction that all persons similarly situated should be treated alike." City of Cleburne v. Cleburne Living Ctr., Inc., 473 U.S. 432, 439, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985) (quoting Plyler v. Doe, 457 U.S. 202, 216, 102 S.Ct. 2382, 72 L.Ed.2d 786 (1982)). Washington's constitution also guarantees such protections. Washington Constitution, article I, section 12. We presume legislation is valid and will sustain it if the classification the statute draws is rationally related to a legitimate state interest. Cleburne, 473 U.S. at 440, 105 S.Ct. 3249.
¶ 26 For the rational basis test, a court must determine whether (1) all members of the class created within the statute are treated alike; (2) reasonable grounds exist to justify the exclusion of parties who are not within the class; and (3) the classification created by the statute bears a rational relationship to the legitimate purpose of the statute. DeYoung v. Providence Med. Ctr., 136 Wash.2d 136, 144, 960 P.2d 919 (1998). Nix bears the burden to show the illegality of it. Gossett v. Farmers Ins. Co., 133 Wash.2d 954, 979, 948 P.2d 1264 (1997).
¶ 27 Nix misapprehends his status under the relevant statutory provisions. The class the statute and the relevant administrative rules established is mentally retarded individuals with such a diagnosis. Former RCW 71A.10.020; WAC 388-823-0200. Reasonable grounds exist to justify the exclusion of parties not within that class because, broadly speaking, those with IQs in excess of 69 do not need the same care as those with IQs below the 70 threshold, based on the well-settled definition of mental retardation. And this classification is rationally related to the statute's purpose to provide DDD services to those with the greatest needs. Additionally, as the Department points out, using bright line rules to differentiate between individuals is permissible under our equal protection analysis. F.C.C. v. Beach Communic'ns., Inc., 508 U.S. 307, 315-16, 113 S.Ct. 2096, 124 L.Ed.2d 211 (1993). In light of this, Nix has not met his burden here to show an equal protection violation. Thus, his argument fails.

ATTORNEY FEES
¶ 28 Nix requests attorney fees under RCW 4.84.350 and RAP 18.1. RCW 4.84.350 provides for attorney fees and costs stemming from judicial review of an agency action to the prevailing party. Because Nix has not prevailed here, he is not entitled to a fee award.
¶ 29 Affirmed.
We concur: ARMSTRONG and HUNT, JJ.
NOTES
[1] Mild mental retardation corresponds to an IQ level of 50-55 to approximately 70.
[2] A CAP provides funding for services, including integrated living services.
[3] The legislature revised RCW 71A.10.020(3) in 2010 to reflect the need to use respectful language in describing disabilities. See Laws of Washington 2010, ch. 94 § 21. Intending no disrespect, we cite former RCW 71A.10.020(3) and use its terms and language as referenced by the parties in their briefing and arguments in this case. We note, however, the legislature has now replaced the phrase "mental retardation" with the phrase "intellectual disability."
[4] The Diagnostic and Statistical Manual of Mental Disorders (Am. Psychiatric Ass'n, 4th ed.) (2000) (DSM-IV-TR). DSM-IV-TR defines "borderline intellectual functioning" as a full-scale IQ of 71 to 84.
[5] Title 71A RCW.
[6] The Department urges us to not reach this issue or the constitutional equal protection question because they were not raised below. But because we review these matters de novo and because Nix raised the issues in his petition for judicial review, we address them.
[7] WAC 388-831-0030 defines "individuals with community protection issues" as follows:

You are considered an individual with community protection issues if:
(1) You have been determined to have a developmental disability as defined in WAC 388-823-0040 and RCW 71A.10.020(3); and
(2) You have been identified by DDD as a person who meets one or more of the following:
(a) You have been charged with or convicted of a crime of sexual violence as defined in chapter 9A.44 or 71.09 RCW;
(b) You have been charged with or convicted of a crime involving sexual acts directed towards strangers or individuals with whom a relationship has been established or promoted for the primary purpose of victimization, or persons of casual acquaintance with whom no substantial personal relationship exists;
(c) You have been charged with or convicted of one or more violent crimes as defined in RCW 9.94A.030(45);
(d) You have not been charged with or convicted of a crime identified in (2)(a), (b), or (c) above, but you have a history of violent, stalking, sexually violent, predatory and/or opportunistic behavior which a qualified professional has determined demonstrates a likelihood to commit a violent, sexually violent and/or predatory act; and
(3) You constitute a current risk to others as determined by a qualified professional.
(4) Charges or crimes that result in acquittal are excluded.
[8] Nix fails to point to any regulation or statutory provision that compels community protection services.