# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| PRESERVE RESPONSIBLE SHORELINE MANAGEMENT, Alice Tawresey, Robert Day, Bainbridge Shoreline Homeowners, Dick Haugan, Linda Young, Don Flora, John Rosling, Bainbridge Defense Fund, Gary Tripp, and Point Monroe Lagoon Home Owners Association, Inc., | No. 56808-0-II |
| Appellants, | |
| v. | UNPUBLISHED OPINION |
| CITY OF BAINBRIDGE ISLAND, Washington State Department of Ecology, Environmental Land Use Hearing Office and Growth Management Hearings Board Central Puget Sound Region, | |
| Respondents, | |
| and | |
| Kitsap County Association of Realtors, | |
| Intervenor Below. | |

PRICE, J. — Preserve Responsible Shoreline Management (PRSM) appeals the Growth

Management Hearing Board's (Board) order upholding the City of Bainbridge Island's (City)

shoreline master program (Master Program). PRSM asserts the following grounds for relief under

the Administrative Procedure Act (APA):[1] the Board erroneously interpreted or applied the law,

---

[1] Ch. 34.05 RCW.

the Board's order was not supported by substantial evidence, and the Board's order was arbitrary or capricious. PRSM also asserts that the Master Program was unconstitutional. We determine that PRSM fails to meet its burden for relief and affirm.

FACTS

I. BAINBRIDGE ISLAND MASTER PROGRAM UPDATE

In 2010, the City began updating its Master Program. The City commissioned several scientific studies to help determine how to protect the shoreline and received public comments on the update to the Master Program.

A. SCIENTIFIC STUDIES

One study, commissioned by the City in 2003, was the Bainbridge Island Nearshore Assessment. The study summarized the then-available science applicable to the shorelines in Bainbridge Island. The study discussed various aspects of the shoreline ecosystem, including discussion of nearshore animal species, nearshore habitats and ecological functions, nearshore physical processes such as erosion and tides, and impacts of human shoreline modifications like bulkheads on nearshore habitats. The study made several recommendations, including that the City produce an inventory of the Bainbridge Island shoreline where the marine habitats meet land.

The second study, commissioned by the City in 2004, was the Bainbridge Island Nearshore Habitat Characterization & Assessment, Management Strategy Prioritization, and Monitoring Recommendations (Nearshore Habitat Characterization). The study separated the 53 miles of shoreline into 9 management areas, comprised of 201 individual shoreline reaches. Each shoreline reach was given an individual ecological function score based in its geomorphology, habitat structure, habitat processes, and other controlling factors.

In 2010, the City commissioned Coastal Geologic Services Inc. to prepare the Bainbridge Island Current and Historic Coastal Geomorphic/Feeder Bluff Mapping. The purpose of the study was to "to map coastal geomorphic shoretypes (such as 'feeder bluffs') and prioritize restoration and conservation sites along the marine shores of Bainbridge Island nearshore . . . ." Administrative Record (AR) at 4152. The study divided the shoreline into 32 areas called "drift cells" and assessed their ability to serve as "functioning sediment sources and transport pathways" necessary to maintain intact coastal geomorphic processes. AR at 4153, 4160. The study addressed the negative impacts of shoreline modifications, such as bulkheads and other forms of shore armoring. The study stated that "sediment impoundment is probably the most significant negative impact" of shore armoring, that "[s]everal habitats of particular value to the nearshore ecosystem rely on intact geomorphic processes and are commonly impacted by shore armor," and that shoreline armoring "can have substantial negative impacts on nearshore habitats" through the loss of marine vegetation, the loss of nearshore large woody debris, and the "partial or major loss of spits that form estuaries and embayments." AR at 4154-55.

In 2011, the City also commissioned an update to the 2003 and 2004 studies, the Addendum to the Summary of the Science Report (Addendum) by Herrera Environmental Consultants Inc. (Herrera). The Addendum relied on more than 250 sources, including studies and reports specific to the Puget Sound. The purpose of the Addendum was to provide "updated information on shoreline and nearshore ecology, physical processes, habitats, and biological resources of Bainbridge Island" and make recommendations for implementation of the "no net loss" standard and for "marine shoreline protective buffers considering geomorphic conditions and shoreline vegetation." AR at 4240-41. Specific to the buffers, the Addendum stated that "[b]uffers can be

3

important to the protection of the functions and processes of the nearshore environments along marine coastlines," and suggested different approaches to shoreline buffers. AR at 4306. The two suggestions for shoreline buffers included fixed-width buffers based on typical conditions present on Bainbridge Island and variable-width buffers, which could result from the different site conditions and resources to be protected. The Addendum stated:

> Approaches to establishing buffers vary between fixed or variable width, with the former generally being the most common (Haberstock et al. 2000). To be effective under a worst-case scenario, and to ensure success in the face of uncertainty about specific site conditions, May (2000) and Haberstock (2000) suggest that fixed-width buffers should be designed conservatively (i.e., larger than the bare minimum needed for protection).

AR at 4314.

Based on the Addendum, the City requested that Herrera make specific recommendations for shoreline buffers to be incorporated into the Master Program. Herrera created two memoranda: August 11, 2011, Memorandum re: Documentation of Marine Shoreline Buffer Recommendation Discussions and August 31, 2011, Memorandum re: Clarification on Herrera August 11, 2011, Documentation of Marine Shoreline Buffer Recommendation Discussions Memo. The memoranda explained that shoreline buffers protect a wide variety of ecological functions, including water quality and mineralization, fine sediment control, shade/microclimate, fish and invertebrate food from litterfall and large woody debris, and hydrology/slope stability. The memoranda summarized the buffer width recommendations made throughout relevant scientific literature and how the buffer widths widely vary based on the protection goal of the buffer. Buffer

width recommendations mostly ranged from 16 to 328 feet, with the buffers width recommendation for removing pollution from stormwater runoff reaching 1,969 feet. The buffers in the scientific research were what the literature stated was necessary to achieve at least 80 percent buffer effectivity.

Herrera recommended that the City establish a two-tiered buffer system. Herrera recommended that "Zone 1" be established as a "riparian protection zone" in which existing native vegetation would be preserved and development would be significantly restricted. AR at 4362. This recommendation was based on the ecological functions provided by native vegetation close to the shoreline that is fundamental to maintaining a healthy functioning marine nearshore. Herrera recommended that Zone 1 extend a minimum of 30 feet from the high water mark, or to the limit of the area of the shoreline that had a 65 percent canopy of native vegetation, whichever was greater, in order to achieve 70 percent or greater effectiveness at protecting water quality. The memorandum stated that 30 foot buffers were the minimum to achieve that 70 percent effectiveness level.

Herrera recommended that "Zone 2," the second tier of the buffer, be comprised of variable-width buffers depending on the shoreline designation of a specific site. Herrera recommended that Zone 2 be located immediately landward of Zone 1 and serve to provide additional protection to the riparian protection zone and other protection functions. Herrera's recommendations included the consideration that Bainbridge Island's shorelines were 82 percent developed, and the City desired to limit the number of existing structures that would be nonconforming with wide shoreline buffers under the proposed Master Program update.

The final item commissioned by the City was the Cumulative Impacts Analysis for City of Bainbridge Island's Shoreline: Puget Sound, prepared by Herrera. This analysis considered whether the Master Program's provisions would ensure no net loss of shoreline ecological functions and fairly allocate the burden of addressing cumulative impacts. This analysis summarized the shoreline's existing conditions based on the previous studies, considered the development that was anticipated on the shoreline, considered the likely impacts of the development on shoreline ecological functions, and considered how implementation of the proposed Master Program would affect those functions. The analysis concluded that "implementation of the proposed [Master Program] is anticipated to achieve no net loss of ecological functions in the City of Bainbridge Island's shorelines." AR at 2206.

B. PUBLIC COMMENTS AND COMMUNICATION

When the City opened public comments on the Master Program update, it received over 1,600 comments. The City individually responded to almost all of the comments submitted to it, although some of the City's responses only stated, "Comment noted." *E.g.,* AR at 2773. The Department of Ecology (Ecology) received at least 111 comments on the proposed Master Program update, and the City categorized and then responded to the Ecology comments in groups. Some comments did not receive a response from the City.

II. THE MASTER PROGRAM

On July 14, 2014, at the conclusion of the update process, the City approved the proposed Master Program. Following the local government's approval, the Shoreline Management Act of

1971 (SMA)[2] required Ecology to determine if the Master Program comports with state law.[3] RCW 90.58.050. In this case, Ecology approved the City's Master Program on July 16. The Master Program went into effect on July 30, 2014.

A. GOALS AND STANDARDS IN THE MASTER PROGRAM

The Master Program's "Master Goal" contained in section 1.5 stated, "An over-arching goal of this master program is to ensure that future use and development of the City's shoreline maintain a balance between competing uses, results in no net loss of shoreline ecological functions, and achieves a net ecosystem improvement over time." AR at 50.

The Master Program stated that "[t]he 'precautionary principle' was employed as guidance in updating the policies and regulations of this [Master Program]." AR at 42. The Master Program cited WAC 173-26-201(3)(g)[4] as authority for the precautionary principle.

B. SHORELINE BUFFERS

Chapter four of the Master Program imposed shoreline buffers and dictated their widths. The Master Program defines a "buffer" as:

> An area of land that is designed and designated to permanently remain vegetated in a predominantly undisturbed and natural condition and/or an area that may need to be enhanced to support ecological processes, or ecosystem-wide functions and to

---

[2] Ch. 90.58 RCW.

[3] "Local government shall have the primary responsibility for initiating the planning required by this chapter and administering the regulatory program consistent with the policy and provisions of this chapter. The department shall act primarily in a supportive and *review capacity* with an emphasis on providing assistance to local government and on *insuring compliance with the policy and provisions of this chapter*." RCW 90.58.050 (emphasis added).

[4] "As a general rule, the less known about existing resources, the more protective shoreline master program provisions should be to avoid unanticipated impacts to shoreline resources." WAC 173-26-201(3)(g).

protect an adjacent aquatic or wetland area from upland impacts and to provide habitat for wildlife.

AR at 260.

Under section 4.1.3.5(3) of the Master Program, property owners must meet the City's vegetation management requirements through the use of buffers. The standardized shoreline buffers are separated into two zones. Consistent with the recommendations from Herrera in its scientific study, Zone 1 extends landward from the ordinary high water point a minimum of 30 feet or to the limit of the 65 percent native vegetation canopy, whichever is greater, as described in "Table 4-3." Within Zone 1, existing vegetative cover must remain.

Zone 2 extends landward from the landward boundary of Zone 1 to the outer edge of the total shoreline buffer set forth in Table 4-3. Table 4-3 identifies five land designations and the buffer widths for the different shoreline categories. Activities are less restricted in Zone 2, and property owners may develop and utilize decks, gardens, and some other residential uses, as long as impacts on shoreline ecological function are mitigated.

III. PRSM'S PETITION FOR REVIEW TO THE BOARD

In October 2014, PRSM filed a petition for review with the Board, asserting that the City's Master Program violated the SMA. PRSM amended its petition in November 2014. PRSM named the City and Ecology as respondents.

In its amended petition to the Board, PRSM raised the issues of:

24. Whether the City is not in compliance with RCW 90.58.130 and WAC 173-26-090 by failing to encourage public participation by not responding to public comments.

. . . .

60. Whether the City is not in compliance with RCW 90.58.100(1) and WAC 173-26-201 in failing to identify and assemble the most current, accurate,

and complete scientific and technical information available, failing to consider the context, scope, magnitude, significance, and potential limitations of the scientific information, and make use of and incorporate all available scientific information. In particular, the City's failures in regard to technical and scientific information are evident in regard to:

. . . .

c. The fact that the buffers selected were not driven by science-based information but City policy unrelated to science;

. . . .

e. The master program provisions are not based on a reasoned, objective evaluation of the relative merits of the conflicting scientific data.

AR at 572, 580-81.

In its prehearing brief for the Board, PRSM argued that the City erred when it relied on "policy, rather than science" when it established the shoreline buffers. AR at 3708. PRSM identified that the specific policy consideration to which it was referring was the City's consideration of the number of existing structures that would not conform to the Master Program's shoreline buffers. PRSM asserted that "the suggested minimum buffer was based on ensuring that residential structures would be nonconforming." AR at 3708. In other words, PRSM believed the City increased the size of the buffers, not because the science required it, but because the City simply wanted to cast as wide of a net as possible to increase the number of structures that would be considered nonconforming.

PRSM also argued in its prehearing brief that the buffers were oversized to excessively improve the "ecological functions" beyond what the SMA allows and the City deviated from the no net loss standard. AR at 3708. PRSM stated that the shoreline buffers "must be used to achieve the goal of 'no net loss,' not improvement which would be a benefit to the public at large." AR at 3708.

9

IV.  THE BOARD'S DECISION

In April 2015, the Board issued its 119 page final decision and order concluding that PRSM failed to demonstrate that the Master Program violated the SMA.

With respect to the City's responses to public comments, the Board found that PRSM failed to meet its burden establishing that the City's failure to answer all public comments violated RCW 36.70A.140 and WAC 173-26-090.  The Board stated that while the statute and rule required the City to participate and respond to comments, they did not require personal responses to every individual comment.  The Board determined that a "response" to a public comment requires only that the City take that comment into consideration.  AR at 5804.  The Board also stated that if it was error for the City to fail to answer every individual comment, exacting compliance was not required to uphold the Master Program, citing to RCW 36.70A.140.  That statute provides:

> Errors in exact compliance with the established program and procedures shall not render the comprehensive land use plan or development regulations invalid if the spirit of the program and procedures is observed.

RCW 36.70A.140.

Next, the Board determined that PRSM failed to carry its burden to show the City did not adequately justify its decision with scientific support in violation of RCW 90.58.100(1) and WAC 173-26-201.  The Board discussed the studies that the City commissioned, including stating that the Herrera documents cited current Pacific Northwest marine shoreline analyses.

When analyzing whether the City's reliance on policy considerations was appropriate, the Board quoted one of Herrera's 2011 memoranda that stated, "[I]ts buffer width recommendations are informed by the City's desire to limit the number of non-conforming structures therefore, existing distances to residential structure from the shoreline are considered."  AR at 5824

10

(emphasis omitted) (internal quotation marks omitted). But the Board suggested the City's use of this policy actually benefited PRSM's desire for smaller buffers. The Board said, "If the buffer width decision were to be driven solely by science, the buffers could be much greater." AR at 5824. The Board also recognized "there is credible evidence in the record that science would not support a vegetative buffer of less than 50 feet, the minimum required in the Native Vegetation Zones of the [former Master Program] for residential designations." AR at 5824-25.

The Board acknowledged that use of policy considerations was not impermissible under the SMA, quoting *Lake Burien Neighborhood v. City of Burien*, which stated, "The SMA process does incorporate the use of scientific information, but it does so as part of the balancing of a range of considerations, such as public access, priority uses, and the development goals and aspirations of the community." AR at 5825 (quoting No. 13-3-0012, at 11 (Wash. Cent. Puget Sound Growth Mgmt. Hr'gs Bd. June 16, 2014) (Final Decision & Order)).[5] The Board stated that when the City identifies conflicting science on the range of buffer width recommendations in accordance with the WAC, buffer widths are a policy decision. The Board found that "the City's incorporation of policy as well as science into its buffer width determination does not per se violate the SMA or the guidelines." AR at 5825 (emphasis omitted).

In response to PRSM's argument that the Master Program was not based on reasoned objective evaluation of the merits of the conflicting scientific data, the Board stated that the City gave reasoned consideration to opposing science, while building the Master Program around the consensus science incorporated on the requirements of the guidelines.

---

[5] https://eluho.wa.gov/api/document/file/3568.

In considering whether the City specifically violated WAC 173-26-201(2)(a), which requires governments to use scientific and technical information in the program development process, the Board observed that the City had "certainly" identified "assumptions made concerning, and data gaps in, the scientific information" when the City received a memo from an advisory committee acknowledging scientific uncertainties, and the Addendum by Herrera also expressed the limitations of existing research. AR at 5828 (internal quotation marks omitted). But the Board determined that the City assembled current scientific data and considered the gaps in scientific data and uncertainties. The Board concluded that PRSM failed to meet its burden of proof to establish a violation of WAC 173-26-201(2)(a), and that the City had assembled and utilized scientific and technical information.

In the end, the Board rejected all of PRSM's arguments and denied PRSM's petition.

V. PRSM'S APPEAL

PRSM filed a petition for review of the Board's final decision and order with the superior court. In addition to arguing the Board erred, PRSM also argued that the Master Program violated the unconstitutional conditions doctrine, and was therefore unconstitutional. The superior court denied PRSM's petition.

PRSM appeals.

ANALYSIS

PRSM challenges the City's Master Program and the Board's decision to uphold it with two main arguments. First, PRSM challenges the Master Program's shoreline buffers by arguing the City wrongfully used the "precautionary principle" without first making the required record, the City based the buffers on a net improvement standard without making the required record, and

12

the City failed to respond to public comments about the buffers. Second, PRSM makes a facial

constitutional challenge to the shoreline buffers. We reject both arguments.

I. LEGAL PRINCIPLES

On a petition for judicial review of a growth board decision, we apply the standards of the

APA. *King County v. Cent. Puget Sound Growth Mgmt. Hr'gs Bd. (King County 1)*, 142 Wn.2d

543, 552, 14 P.3d 133 (2000). We review the board's decision, not the decision of the superior

court. *Id.* at 553. Under the APA, we will only grant relief from an agency's adjudicative order if

it fails to meet any of the nine standards from RCW 34.05.570(3). *Lewis County. v. W. Wash.*

*Growth Mgmt. Hr'gs Bd.*, 157 Wn.2d 488, 498, 139 P.3d 1096 (2006).

Here, PRSM asserts that five of the nine standards of RCW 34.05.570(3) apply:

(a) The order, or the statute or rule on which the order is based, is in violation of constitutional provisions on its face or as applied;

(b) The order is outside the statutory authority or jurisdiction of the agency conferred by any provision of law;[6]

. . . .

(d) The agency has erroneously interpreted or applied the law;

(e) The order is not supported by evidence that is substantial when viewed in light of the whole record before the court, which includes the agency record for judicial review, supplemented by any additional evidence received by the court under this chapter;

---

[6] Although PRSM lists RCW 34.05.570(3)(b) (order is outside the statutory authority or jurisdiction of the agency) as a ground for relief in this case, it does not offer any citations to authority or the record to show that this ground for relief applies. PRSM additionally fails to mention RCW 34.05.570(3)(b) or explain how it applies after initially mentioning that it is one of the five grounds for relief that are applicable in this case. We do not consider arguments that are unsupported by citations to authority or the record. *Cowiche Canyon Conservancy v. Bosley*, 118 Wn.2d 801, 809, 828 P.2d 549 (1992) (failure to provide argument and citation to authority in support of an assignment of error precludes appellate consideration under RAP 10.3(a)). We do not further consider this ground.

. . . .

(i) The order is arbitrary or capricious.

RCW 34.05.570(3). Under the APA, the party asserting invalidity of a growth board decision has the burden of proving the invalidity. RCW 34.05.570(1)(a); *King County 1*, 142 Wn.2d at 553.

Invalidity challenges under RCW 34.05.570(3)(d) regarding whether the agency erroneously interpreted or applied the law are reviewed de novo. *City of Redmond v. Cent. Puget Sound Growth Mgmt. Hr'gs Bd.*, 136 Wn.2d 38, 46, 959 P.2d 1091 (1998). Deference is given to the agency's interpretation of the law "where the agency has specialized expertise in dealing with such issues, but we are not bound by an agency's interpretation of a statute." *Id*. at 46.

"In reviewing agency findings under RCW 34.05.570(3)(e), substantial evidence is 'a sufficient quantity of evidence to persuade a fair-minded person of the truth or correctness of the order.' " *Id.* (quoting *Callecod v. Wash. State Patrol,* 84 Wn. App. 663, 673, 929 P.2d 510, *review denied,* 132 Wn.2d 1004 (1997)). We view the evidence in the light most favorable to the party who prevailed before the board, and give deference to the board's factual findings. *Olympic Stewardship Found. v. Env't. & Land Use Hr'gs Office ex rel. W. Wash. Growth Mgmt. Hr'gs Bd. (OSF)*, 199 Wn. App. 668, 710, 399 P.3d 562 (2017), *review denied*, 189 Wn.2d 1040, *cert. denied*, 139 S. Ct. 81 (2018).

For challenges under RCW 34.05.570(3)(i), "arbitrary and capricious" means " 'willful and unreasoning action, taken without regard to or consideration of the facts and circumstances surrounding the action.' " *City of Redmond*, 136 Wn.2d at 46-47 (quoting *Kendall v. Douglas, Grant, Lincoln & Okanogan Counties Pub. Hosp. Dist. No. 6*, 118 Wn.2d 1, 14, 820 P.2d 497 (1991)). " 'Where there is room for two opinions, an action taken after due consideration is not

14

arbitrary and capricious even though a reviewing court may believe it to be erroneous.' " *Id.* at 47 (quoting *Kendall*, 118 Wn.2d at 14).

II. PRECAUTIONARY PRINCIPLE

PRSM argues that the City failed to create a record sufficient to support the City's alleged use of the precautionary principle. The City responds that PRSM did not sufficiently raise this issue related to the precautionary principle below and is now precluded from raising the issue on appeal. We agree with the City.

The "precautionary principle" originates from WAC 173-26-201(3)(g), which states:

As a general rule, the less known about existing resources, the more protective shoreline master program provisions should be to avoid unanticipated impacts to shoreline resources. If there is a question about the extent or condition of an existing ecological resource, then the master program provisions shall be sufficient to reasonably assure that the resource is protected in a manner consistent with the policies of these guidelines.

Under the APA, issues not raised to the Board may generally not be raised for the first time on appeal. RCW 34.05.554(1); *see also Kitsap All. of Prop. Owners v. Cent. Puget Sound Growth Mgmt. Hr'gs Bd. (KAPO)*, 160 Wn. App. 250, 271-72, 255 P.3d 696, *review denie*d, 171 Wn.2d 1030 (2011), *cert. denied*, 566 U.S. 904 (2012). New issues may only be raised if they fall under a statutory exception. RCW 34.05.554; *see also US W. Commc'ns, Inc. v. Wash. Utils. & Transp. Comm'n*, 134 Wn.2d 48, 72, 949 P.2d 1321 (1997).

"In order for an issue to be properly raised before an administrative agency, there must be more than simply a hint or a slight reference to the issue in the record." *King County v. Boundary Rev. Bd. for King County (King County 2)*, 122 Wn.2d 648, 670, 860 P.2d 1024 (1993).

The City argues that PRSM did not argue to the Board below that the City improperly relied on the precautionary principle as part of PRSM's insufficient record argument to establish shoreline buffers, and therefore cannot do so now. PRSM responds, essentially, that it got close enough; PRSM asserts that it argued below that the City relied on "policy unrelated to science" and that this argument sufficiently covers the precautionary principle. Appellant's Reply Br. at 8.

Here, neither the phrase "precautionary principle" nor WAC 173-26-201(3)(g) ever appear in PRSM's petition for review, amended petition for review, or prehearing brief to the Board. PRSM, however, argues this omission is not dispositive. It asserts its arguments below were sufficiently linked to the precautionary principle, pointing to its allegations that the City did not

> identify and assemble the most current, accurate, and complete scientific and technical information available . . . . In particular, the City's failure in regard to technical and scientific information are evident in regard to:
>
> . . . .
>
> c. The fact that the buffers selected were not driven by science-based information but *the City policy unrelated to science*.

AR at 580 (emphasis added). PRSM also argues that its prehearing brief to the Board sufficiently described the City's reliance on the precautionary principle in several places. PRSM asserts that its brief "argued that the City had imposed oversized buffers based, not on science, but on its preference for providing more protection to the shoreline than is strictly necessary to mitigate for the minimal impacts of residential use." Appellant's Reply Br. at 9. Additionally, PRSM argued in its prehearing brief to the Board that the buffers were oversized to excessively improve the ecological functions and "did not appear to have any scientific basis." AR at 3708. These arguments, according to PRSM, focus on the legal standards for invoking the precautionary principle.

16

PRSM's position is unpersuasive. At no point did PRSM's "policy" argument below resemble a complaint related to the precautionary principle. The policy PRSM identified below was the City's basing buffer widths on "existing distances to residential structures from the shoreline . . . ." AR at 3708. The City's improper policy was that the buffers were "based on ensuring that residential structures would be nonconforming." AR at 3708.

Any argument to the Board about the precautionary principle would have required PRSM to allege some iteration of an argument related to insufficient science—essentially that the City was overly conservative with its shoreline buffers because of the absence of sufficient science or, perhaps, that the City made long-term buffer decisions based on the temporary insufficiency of the science without committing to updating the science. But these were not the arguments PRSM made below. Whether or not structures that existed on the shoreline would conform to the Master Program requirements is not a consideration related to the precautionary principle.

Simply put, because PRSM's prehearing brief to the Board argued that the improper policy consideration was one unrelated to the precautionary principle, PRSM's reference to the use of "policy unrelated to science" falls short of even hinting to, or slightly referencing, the precautionary principle. Arguing that the buffers were based on policy, not science, is not the same as arguing that the buffers were implemented because the City either had, or disingenuously blamed, *insufficient* science. Even aside from the fact that words "precautionary principle" did not appear in PRSM's briefs to the Board, PRSM never made arguments that describe the precautionary principle generally.

To preserve an argument for appeal to this court, PRSM was required to raise the argument to the Board or fit into a statutory exception (and PRSM does not argue that the City's alleged use

17

of the precautionary principle may be challenged under a statutory exception). Accordingly, because PRSM did not argue that the City improperly relied on the precautionary principle to the Board, it is precluded from making this argument now. *See* RCW 34.05.554(1).

### III. NO NET LOSS

PRSM also argues that the City did not create the required record to justify departing from the "no net loss" standard to instead achieve "net ecosystem improvement." Appellant's Opening Br. at 47. PRSM argues the City cannot justify its focus on shoreline improvement at the expense of development because that would violate the SMA's more modest goal of prevention of net ecological loss.[7] PRSM appears to challenge the Board's decisions on this issue by alleging invalidity through RCW 34.05.570(3)(d), (e), and (i). We affirm the Board's decisions on this issue.

The concept of "no net loss" is found throughout the SMA; one representative reference is found in WAC 173-26-201(2)(c). This section states, "Master programs shall contain policies and regulations that assure, at minimum, *no net loss of ecological functions* necessary to sustain shoreline natural resources." WAC 173-26-201(2)(c) (emphasis added). WAC 173-26-201(2)(f) further states, "[M]aster program provisions should be designed to achieve overall *improvements*

---

[7] Like the precautionary principle, the City argues PRSM did not preserve this issue before the Board by alleging a departure from a no net loss standard below. However, unlike the precautionary principle, PRSM did make reference to this issue below. It argued in its prehearing brief to the Board that, in establishing shoreline buffer widths, "the City's strategy [was] to improve the ecological functions within the current residential development pattern." AR at 3708 (emphasis omitted) (internal quotation marks omitted). PRSM further stated that the shoreline buffers "must be used to achieve the goal of 'no net loss,' not improvement which would be a benefit to the public at large." AR at 3708. PRSM's statements in its brief are more than a hint or slight reference to the City's alleged departure from the no net loss standard, thereby preserving this issue for appeal. *King County 2*, 122 Wn.2d at 670.

*in shoreline ecological functions* over time, when compared to the status upon adoption of the master program." (Emphasis added).

The no net loss concept implicates the process for using scientific and technical information during the development of a master program. A description of this process is found in WAC 173-26-201(2)(a), which requires the local government to:

> First, identify and assemble the most current, accurate, and complete scientific and technical information available that is applicable to the issues of concern. The context, scope, magnitude, significance, and potential limitations of the scientific information should be considered. At a minimum, make use of and, where applicable, incorporate all available scientific information, aerial photography, inventory data, technical assistance materials, manuals and services from reliable sources of science. . . .
>
> . . . .
>
> Second, base master program provisions on an analysis incorporating the most current, accurate, and complete scientific or technical information available. Local governments should be prepared to identify the following:
>
> (i) Scientific information and management recommendations on which the master program provisions are based;
>
> (ii) Assumptions made concerning, and data gaps in, the scientific information; and
>
> (iii) Risks to ecological functions associated with master program provisions. Address potential risks as described in WAC 173-26-201 (3)(d). . . .
>
> . . . Where information collected by or provided to local governments conflicts or is inconsistent, the local government shall base master program provisions on a reasoned, objective evaluation of the relative merits of the conflicting data.

A. RCW 34.05.570(3)(d)—ERRONEOUS INTERPRETATION OR APPLICATION OF THE LAW

PRSM argues that we should grant relief under RCW 35.05.570(3)(d) because the Board erred when it affirmed the City's implementation of shoreline buffer widths that would improve the shoreline without first creating the necessary record. In its prehearing brief to the Board, PRSM argued that Zone 2 of the shoreline was unsupported by science, and the City implemented a net improvement standard in establishing the Zone 2 buffers.

19

In its order, the Board generally determined that the City fulfilled the requirements of WAC 173-26-102(2)(a) that the City assemble the current scientific data and assess its uncertainties. In another part of its analysis, the Board stated the City properly relied on both science and policy when establishing the shoreline buffers. Because the rule fundamentally requires that the City "[f]irst[] identify and assemble the most current, accurate, and complete scientific . . . information available," and second "base [the] master program" on that scientific information, the Board did not err in its interpretation of WAC 173-26-201(2)(a).

While the Board did not specifically address the alleged application of a net improvement standard, the Board did recognize that the science would have supported larger buffers, up to 1,969 feet in width.[8] The science that guided the creation of the buffer widths included recommended buffer widths for at least 80 percent buffer effectiveness, with one suggestion reaching 1,969 feet. The City's buffers for both Zones 1 and 2 were within the recommendations

---

[8] Following our questioning at oral argument about the Board's statements regarding the scientific support for the size of the buffers, PRSM moved to provide supplemental briefing, claiming that these statements were not argued by either party in their initial briefing and unfairly constitute a new issue. PRSM appears to be concerned that this language from the Board raises the question of whether the existing required widths of the buffers satisfy the no net loss requirements of the SMA—an issue PRSM claims was not raised by the parties in this appeal. We agree that whether the current size of the buffers satisfy the no net loss requirements of the SMA is not before us. Therefore, we had no need for additional briefing from the parties.

But we disagree that the Board's statements are not relevant to our present analysis. PRSM argued to the Board that the City's alleged failure to sufficiently develop its record was because the City used policy instead of science. This argument is the foundation of PRSM's current challenge of whether the record supports the alleged implementation of a net improvement standard. The evidentiary record and the Board's related discussion, which prompted our questions at oral argument, are therefore, clearly relevant to PRSM's arguments in this appeal.

of the scientific literature, and the Board stated that the buffers were reduced to smaller than the science would have supported.

If the buffers were smaller than the science would have supported to maintain the ecological functions at 2011 standards, it follows that the buffers were not designed to overly improve the shoreline, meaning a net improvement standard was not implemented as PRSM suggests. Because the City did not improperly apply the net improvement standard, the Board could not have erred in its application of the law on the basis PRSM asserts when the Board determined the City did not violate the law. PRSM fails to meet its burden under RCW 34.05.570(3)(d).

B. RCW 34.05.570(3)(e)—SUPPORTED BY SUBSTANTIAL EVIDENCE

PRSM also asserts that it may be granted relief under RCW 34.05.570(3)(e) because the Board's order was not supported by substantial evidence. The Board identified that the City appropriately relied on the science from its multiple studies in making its determinations about the size and scope of the buffers. Herrera specifically suggested the shoreline buffers that the City adopted, and the Board identified that the scientific literature would have supported larger buffers than the Master Program includes. Because Herrera compiled literature that suggested buffers larger than the existing buffers to achieve at least 80 percent buffer effectivity, the bulk of the evidence disproves PRSM's allegation that the City applied a net improvement standard. When viewed in the light most favorable to the City as the prevailing party, the Board's order is supported by substantial evidence. PRSM fails to meet its burden that the Board's order was not supported by substantial evidence.

C.  RCW 34.05.570(3)(i)—ARBITRARY OR CAPRICIOUS

PRSM also argues that they may be granted relief because the Board's order was arbitrary and capricious under RCW 34.05.570(3)(i).  The analysis above shows that the Board relied on evidence in the record and applied that evidence to the law.  Because the Board relied on evidence in the record to make its decision and issue its order, the Board did not act willful and unreasoned without regard to, or consideration of, the facts and circumstances surrounding the action.  Its order was therefore not arbitrary and capricious.

IV.  RESPONSE TO PUBLIC COMMENTS

PRSM next complains about the City's alleged failure to respond to public comments about the precautionary principle.  Below, the Board determined that the City did not violate the SMA when it did not answer all of the public comments.  Like its other challenges to the Board's decision, PRSM appears to argue that this decision from Board's order violates RCW 34.05.570(3)(d), (e), and (i).  The City responds that the Board accurately determined that the City was not required to answer all public comments individually.[9]  We agree with the City.

The SMA imposes an obligation to involve the pubic in the development of a shorelines master program.  RCW 90.58.130 states:

> To insure that all persons and entities having an interest in the guidelines and master programs developed under this chapter are provided with a full opportunity for involvement in both their development and implementation, the department and **local governments shall**:
>
> (1) Make reasonable efforts to inform the people of the state about the shoreline management program of this chapter and in the performance of the responsibilities provided in this chapter, shall not only invite but actively encourage participation

---

[9] The City also responds that while PRSM did argue to the Board that the City failed to adequately respond to comments, PRSM never tied this argument to the precautionary principle.

by all persons and private groups and entities showing an interest in shoreline management programs of this chapter; and

(2) Invite and encourage participation by all agencies of federal, state, and local government, including municipal and public corporations, having interests or responsibilities relating to the shorelines of the state. State and local agencies are directed to participate fully to insure that their interests are fully considered by the department and local governments.

RCW 90.58.130 (emphasis added).

This obligation for local governments to engage and encourage public participation in the

SMA process is further explained in WAC 173-26-090(3)(a), which states:

(i) In conducting the periodic review, the department and local governments, pursuant to RCW 90.58.130, shall make all reasonable efforts to inform, fully involve and encourage participation of all interested persons and private entities, tribes, and agencies of the federal, state or local government having interests and responsibilities relating to shorelines of the state and the local master program. . . .

(ii) Counties and cities shall establish and broadly disseminate to the public a public participation program identifying procedures whereby review of the shoreline master program will be considered by the local governing body consistent with RCW 36.70A.140. **Such procedures shall provide for** early and continuous public participation through broad dissemination of informative materials, proposals and alternatives, opportunity for written comments, public meetings after effective notice, provision for open discussion, and **consideration of and response to public comments.**

(Emphasis added).

A.  RCW 34.05.570(3)(d)—ERRONEOUS INTERPRETATION OR APPLICATION OF THE LAW

PRSM asserts that we should grant relief under RCW 34.05.570(3)(d) because the Board

misinterpreted and misapplied these public participation obligations when it decided the City did

not need to answer every public comment. The Board determined that PRSM "failed to carry its

burden of demonstrating the City's 'consideration of and response to public comments' violated

SMA or GMA requirements." AR at 5805 (quoting WAC 173-26-090(3)). The Board determined

23

that the City did not violate RCW 90.58.130 or WAC 173-26-090 because neither required that the City *answer* every individual public comment, they only require the City to *respond* to comments. The Board recognized that a response to a comment "does not require accepting or agreeing with them — only taking them into consideration." AR at 5804. Further, the City actually answered the majority of comments it received.

RCW 90.58.130, on its face, does not require the City to respond to comments. It requires only that the City make reasonable efforts to inform the public and invite and encourage participation. The Board did not err in its interpretation of this statute because it correctly determined that the statute did not require individual answers to every public comment.

WAC 173-26-090(3)(a), however, does require that the City consider and respond to public comments when it states, "Such procedures shall provide for . . . response to public comments." While this creates a general obligation for the City to respond to comments, the rule stops short of requiring the City to provide an answer to every individual comment. The Board determined that reacting in response to a comment meant that the City consider the argument, and it may choose to answer the comment. We determine this is a reasonable construction of the rule. It recognizes the importance the legislature placed upon public participation, but it does not impose an unreasonably onerous obligation to individually answer, as in this case, over 1,600 comments. The Board did not err in its application of this rule because it correctly determined that the rule does not require the City to answer every comment and a response by the City does not specifically require an answer. PRSM fails to meet its burden to show the Board erred in its interpretation or application of the law.

B. RCW 34.05.570(3)(e)—SUPPORTED BY SUBSTANTIAL EVIDENCE

PRSM also asserts that we should grant relief because the Board's order was not supported by substantial evidence when it determined the City did not violate the relevant statutes. As stated above, the record shows that the City answered the vast majority of comments submitted to both it and Ecology. The City received over 1,600 individual comments and answered almost all of them, even when comments were duplicative. The City also answered the comments made to Ecology. Moreover, as noted above, the City was not required to answer every comment. Because the City responded to nearly all of the comments with answers when they were not required to answer every individual comment, there is substantial evidence to support the Board's order on this issue. PRSM fails to meet its burden to show that the Board's order was not supported by substantial evidence.

C. RCW 34.05.570(3)(i)—ARBITRARY OR CAPRICIOUS

Additionally, the PRSM argues that the Board's order was arbitrary or capricious when it determined the City's failure to answer all comments did not violate the relevant laws. Because the Board considered that the City responded to comments and was not required to answer each one, the Board considered the facts of this case and did not act willful and unreasoned in disregard of these facts. Therefore, the Board's order was not arbitrary and capricious, and PRSM fails to meet its burden for us to grant relief.

V. UNCONSTITUTIONAL CONDITIONS

Outside of its challenge to the Board's order, PRSM makes a constitutional challenge to the shoreline buffers in the City's Master Program.[10] PRSM argues that the shoreline buffers in the Master Program violate the doctrine of unconstitutional conditions because they do not pass the nexus and proportionality tests. Ecology and the City argue that the Master Program passes the nexus and proportionality tests when the City relied on the best available science. We agree with the City.

Constitutional challenges are questions of law that are reviewed de novo. *OSF*, 199 Wn. App. at 710. We have previously determined that for constitutional challenges to a master program under the SMA, the party asserting invalidity "bears the burden of proving its unconstitutionality beyond a reasonable doubt." *Id*.

Under the doctrine of unconstitutional conditions, "the government may not require a person to give up a constitutional right . . . in exchange for a discretionary benefit . . . ." *Dolan v. City of Tigard*, 512 U.S. 374, 385, 114 S. Ct. 2309, 129 L. Ed. 2d 304 (1994). The *Dolan* and *Nollan* cases involve a specific application of the unconstitutional conditions doctrine. *Dolan*, 512 U.S. 374; *Nollan v. Cal. Coastal Comm'n*, 483 U.S. 825, 107 S. Ct. 3141, 97 L. Ed. 2d 677 (1987). *Dolan* and *Nollan* stand for the proposition that the government may not condition approval of a land-use permit on the owner's relinquishment of a portion of his property unless there is a nexus and rough proportionality between the government's demand and the effects of the proposed land

---

[10] PRSM's unconstitutional conditions argument is outside of its challenge of the Board's order because the Board did not have the authority to decide constitutional issues and did not decide the issue. *Bayfield Res. Co. v. W. Wash. Growth Mgmt. Hr'gs Bd.*, 158 Wn. App. 866, 880-81, 244 P.3d 412 (2010).

use.  *Koontz v. St. Johns River Water Mgmt. Dist.*, 570 U.S. 595, 599, 133 S. Ct. 2586, 186 L. Ed. 2d 697 (2013).

*Nollan* and *Dolan* set forth the nexus and rough proportionality tests that the regulation must pass to be constitutional under the unconstitutional conditions doctrine.  *Nollan*, 483 U.S. at 837; *Dolan*, 512 U.S. at 391.  The nexus test permits only those conditions necessary to mitigate a specific adverse impact of a proposal.  *KAPO*, 160 Wn. App. at 272 (citing *Nollan*, 483 U.S. 825).  The rough proportionality test limits the extent of required mitigation measures to those that are roughly proportional to the impact they are designed to mitigate.  *KAPO*, 160 Wn. App. at 272-73 (citing *Dolan*, 512 U.S. 374).

However, *Nollan* and *Dolan* involved as-applied challenges to regulations that implemented conditional requirements for permit approvals.  *See Nollan*, 483 U.S. at 831-32; *Dolan*, 512 U.S. at 391.  In the context of a facial challenge to a land use ordinance, the ordinance "must comply with the nexus and rough proportionality limits the United States Supreme Court has placed on governmental authority to impose conditions on development applications." *Honesty in Env't. Analysis & Legis. v. Cent. Puget Sound Growth Mgmt. Hr'gs Bd. (HEAL)*, 96 Wn. App. 522, 533, 979 P.2d 864 (1999) (plaintiffs made a facial challenge to the Growth Management Act (GMA)) (footnotes omitted).

The SMA requires the use of a "reasoned, objective evaluation" of the scientific and technical information when creating master programs.  WAC 173-26-201(2)(a).  This is analogous to the requirement found in the GMA to use the "best available science" to set the general requirements in land use ordinances.  RCW 36.70A.172(1).  When it is shown that the local government meets this standard, the nexus and rough proportionality tests are generally satisfied.

*KAPO*, 160 Wn. App. at 273. "If a local government fails to incorporate, or otherwise ignores the best available science, its policies and regulations may well serve as the basis for conditions and denials that are constitutionally prohibited." *HEAL*, 96 Wn. App. at 533. Use of the best available science is "generally interpreted to require local governments to analyze valid scientific information in a reasoned process." *KAPO*, 160 Wn. App. at 267. "If the local government used the best available science in adopting its critical areas regulations [under the GMA], the permit decisions it bases on those regulations will satisfy the nexus and rough proportionality rules." *Id.* at 273. Similarly, we determine that meeting the SMA's requirement for a reasoned, objective evaluation of the scientific and technical information satisfies the nexus and proportionality tests.

PRSM is making a facial challenge to the Master Program specific to the shoreline buffers. The parties appear to agree that the nexus and proportionality tests apply to this facial challenge of the Master Program. PRSM argues that the Master Program does not meet the nexus and proportionality tests because the Master Program does not require identification of anticipated development impacts of ecological conditions and the City set general default buffers based on mere assumptions of shoreline conditions.

Here, the City assembled an extensive scientific record supporting the Master Program and the shoreline buffers. This record included the following items: Bainbridge Island Nearshore Assessment; Nearshore Habitat Characterization; the Bainbridge Island Current and Historic Coastal Geomorphic/Feeder Bluff Mapping; the Addendum; Memorandum re: Documentation of Marine Shoreline Buffer Recommendation Discussions; Memorandum re: Clarification on Herrera August 11, 2011 Documentation of Marine Shoreline Buffer Recommendation Discussions

Memo; and the Cumulative Impacts Analysis for City of Bainbridge Island's Shoreline: Puget Sound.

The studies cited by the City documented the conditions and ecological functions of the Bainbridge Island shoreline. The studies also showed the anticipated impacts of anticipated development on the existing conditions of the shoreline. The studies additionally made detailed recommendations for shoreline regulations, including the shoreline buffers that were adopted by the City, to ensure that the impacts of development would be mitigated and no net loss of shoreline ecological functions would occur.

The City has shown that the Master Program relied on the valid scientific information to establish the shoreline buffers because it implemented the buffers suggested by Herrera and the buffers were based on the science.[11] Because the City relied on extensive scientific research, we conclude that it used a reasoned, objective analysis of the science to create the Master Program. *See KAPO*, 160 Wn. App. at 270.

This is fatal to PRSM's facial challenge. Just like using the best available science satisfies the nexus and rough proportionality tests in GMA cases, the use of a reasoned, objective analysis of the science is sufficient to pass the nexus and rough proportionality tests in SMA cases. The Master Program passes these nexus and proportionality tests because the City relied on multiple

---

[11] The determination that the Master Program was based on science does not conflict with the Board's conclusion that the City appropriately used both science and policy to create the shoreline buffers. To fail the nexus and proportionality tests, the buffer widths would need to be in excess of what the science would allow. Because the Board determined that the science alone would have supported larger buffers, the Board's analysis does not contradict our determination that the City used a reasoned, objective analysis.

scientific studies when establishing the shoreline buffer widths. *See KAPO*, 160 Wn. App. at 273-74.

Because the Master Program passes the nexus and proportionality tests, PRSM has not met its burden to show that the Master Program's shoreline buffers violate the doctrine of unconstitutional conditions.

## CONCLUSION

We affirm the superior court's order determining that the City's Master Program comports with the SMA.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

PRICE, J.

We concur:

WORSWICK, J.P.T.

VELJACIC, J.