IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| YI SWEENEY,<br><br>          Petitioner,<br><br>     v.<br><br>WASHINGTON STATE OFFICE OF<br>THE INSURANCE COMMISSIONER,<br><br>          Respondent. | No. 84092-4-I<br><br>DIVISION ONE<br><br>UNPUBLISHED OPINION |

DÍAZ, J. — Yi Sweeney appeals the Office of the Insurance Commissioner's (OIC) revocation of her resident insurance producer license. OIC found that Sweeney shuffled clients from one type of Medicare plan to another, then immediately re-enrolled them back to their original plans to obtain the commissions, all without the clients's consent, which was in violation of OIC's regulations. Sweeney now argues that OIC's Administrative Law Judge (ALJ) erroneously applied the preponderance of the evidence standard; erroneously admitted hearsay evidence, such that substantial evidence did not support the OIC's revocation; the revocation was an arbitrary and capricious penalty; and her own polygraph test was improperly excluded. Finding no error, we affirm.

## I.    FACTS

### A.    Background

Sweeney[1] obtained her first resident insurance producer license in 2015. She began to sell Medicare products for United Health Care (UH) in 2016, such as its specialized supplemental Medicare and Medicaid-eligible plan (Dual Complete).[2] According to Sweeney, UH recruited her to communicate with seniors who were Chinese-speaking and low-income and, thus, eligible for UH's Dual Complete plans because other insurance producers were unable to communicate with these consumers. Sweeney asserted consumers were often distrustful of the government and insurance companies, and feared losing their Medicaid-only benefits. At the time, again according to Sweeney, there were no other Chinese-speaking insurance producers in the greater Seattle area.

In 2017, Sweeney failed the re-certification test, which was required to sell UH's Medicare Advantage Plan (a Dual Complete plan). For reasons not expanded upon, she failed the certification test six times. Her failure to pass the test meant that she could not sell the Dual Complete plans for 2018, nor could she earn a commission on those sales or renewals, but she still could sell other products. According to Sweeney, she had enrolled approximately 200 consumers in a Dual Complete Plan in 2016 for 2017.

---

[1] Yi Sweeney's former last name is Peng, to which she is sometimes referred. We, however, will refer to her by the name under which she appealed.

[2] Four different types of health plans are relevant here: Medicare Part A, which covers hospital visits, skilled nursing care hospice, and some home care for people 65 years and older, 42 U.S.C. § 1395c; Medicare Part B, covering doctor visits, medical equipment, and some health care coverage, 42 U.S.C. § 1395k; Medicare Part C, which serves high needs populations letting them choose from private benefits not offered by the federal government, 42 U.S.C. § 1395w-21; and "Dual" plans which serve people who are both low-income (Medicaid eligible) and also have high needs, often age or disability. Often these are very low-income seniors.

Sweeney does not dispute that she was not certified to sell the Dual Complete Plan to the consumers in 2018. However, as she told it, after failing the certification test, she continued to provide other services to the seniors, such as helping them contact care coordinators and helping them access translation services.

By "early in 2019," Sweeney again became certified to sell the UH Dual Complete Plans.

It is undisputed that, in approximately a 15-hour period between March 30 and 31, 2019, Sweeney created profiles for, and dis-enrolled and re-enrolled, 120 to 133 consumers from the UH Dual Complete Plan to a "original" Medicare plan and back.[3] She listed her phone number and email as the contact information for most of them. The creation of a profile and resulting dis-enrollment and re-enrollment required a signature from the consumer, which appeared on each file.

Sweeney claims that this was done with each person's consent. Namely, she claims that, in early 2019, when she would see the client in person, she would ask them whether they liked their UH Dual Complete Plan and whether they wanted her to remain as their producer. She would then ask permission to transfer them to their original Medicare plan for one month, and then she would re-enroll them in the Dual Complete plan. "When they expressed yes, I would enroll them and capture their signature." Sweeney claims she captured their signatures with a mouse on her laptop.

---

[3] Sweeney testified that, because of a built in "grace period," no client would be harmed by this process, i.e., there would be no gap in coverage between an "original" Medicare plan and the Dual Complete Benefits.

Although Sweeney claims these conversations with consumers occurred in "early 2019," four of the consumers had died by January 8, 2019, some in 2018.[4]

Sweeney claimed she captured each consumer's signature in-person, and saved it to UH's software program, LEAN, to be submitted at a later time. Pierce DuCharme, a business process analyst for UH, testified that such a scenario is impossible under LEAN, unless Sweeney left the internet browser tabs with the pending signatures open for months.

Beginning in early April 2019, Clara Yu, a support services specialist at the Chinese Information Service Center in Seattle, received complaints from approximately 11 consumers who had been disenrolled from their Medicare Advantage plan, then re-enrolled around a month later without their permission. Upon receiving these complaints, Yu filed a complaint with OIC on April 9. Yu filed an additional complaint on April 18 on behalf of SHIBA volunteers[5] who had received similar complaints from Sweeney's clients. Yu continued to update OIC on complaints from consumers.

OIC opened an investigation into Sweeney's mass enrollments on May 15, 2019. Jamie Bariekman, a senior investigator with OIC, submitted a declaration summarizing his efforts. Bariekman also interviewed and obtained declarations from several consumers who stated they did not give Sweeney permission to disenroll them and then re-enroll them in their Dual Complete plans. Bariekman also reviewed the documentary data available to OIC about Sweeney's enrollments and disenrollment; and relevant

---

[4] Sweeney testified that she received these clients's consent before they died, that she resubmitted them on accident, and, after receiving notices of their deaths (after she re-enrolled them), was not allowed to rescind their enrollments.
[5] SHIBA is a program run by OIC, that provides an unbiased resource for seniors to navigate complex issues with their Medicare coverage.

information about consumer signatures and death certificates for those consumers who predeceased their re-enrollment.

Around the same time, UH opened its own investigation into Sweeney's insurance production.

On June 19, 2020, OIC issued an order to revoke Sweeney's license. (Order No. 20-0554). The same day, Sweeney filed a demand for hearing with OIC's Hearing Unit. The Hearing Unit transferred the matter to the Office of Administrative Hearings (OAH).

**B.**     **The Administrative Process**

Sweeney's appeal was heard before an OAH's ALJ, T.J. Martin, in March and April 2021. Sweeney was represented by counsel and was able to testify on her own behalf. She also introduced one witness to testify for her, Dong Ma, a colleague from UH. OIC offered five witnesses to testify to revoking Sweeney's license: DuCharme; Sarah Gelemeev, a UH investigator; Kathleen Nevells, UH's director of sales operations; Tyler Robbins, an OIC regulatory investigator; and Judith Bendersky, an OIC health insurance adviser.

Furthermore, eleven of Sweeney's twelve proposed exhibits were admitted, and OIC's 24 exhibits were admitted with two withdrawn. Sweeney's only proposed exhibit that was deemed inadmissible was her polygraph examination.

On June 14, 2021, the ALJ affirmed the OIC's initial order revoking Sweeney's license. (Docket No. 06-2020-INS-0084). The matter was referred to OIC for review. In December 2021, OIC's chief reviewing officer affirmed the initial order from the ALJ. The chief reviewing officer further adopted the ALJ's findings of fact and conclusions of law,

with a few additions, in a final order.  Sweeney appeals the OIC's chief reviewing officer's final order.

## II.    ANALYSIS

Because Sweeney appealed a final order of an administrative proceeding, under the Administrative Procedure Act (APA), judicial review is of the final decision by the agency and the administrative record before this panel.  Ch. 34.05 RCW.  We review the final order issued on January 8, 2022, which adopted the ALJ's findings of fact and conclusions of law, with some additions, issued June 14, 2021.  RCW 34.05.464(4).

The APA allows a reviewing court to reverse an administrative decision when, (1) the administrative decision is based on an error of law; (2) the decision is not based on substantial evidence; or (3) the decision is arbitrary or capricious.  RCW 34.05.570(3); Tapper v. State Emp't Sec. Dep't, 122 Wn.2d 397, 402, 858 P.2d 494 (1993), superseded by statute on other grounds.  "In reviewing administrative action, this court sits in the same position as the superior court," applying the standards of the APA directly to the record before the agency.  Id.

The party asserting the invalidity of agency action has the burden of demonstrating the invalidity of the action.  Shaw v. State, Dep't of Ret. Sys., 193 Wn. App. 122, 128, 371 P.3d 106 (2016) (citing RCW 34.05.570(1).

"We review for substantial evidence in light of the whole record."  Campbell v. State Emp't Sec. Dep't, 180 Wn.2d 566, 571, 326 P.3d 713 (2014) (citing RCW 34.05.570(3)(e)).  "Substantial evidence" is evidence of a "sufficient quantity . . . to persuade a fair-minded person of the truth and correctness" of the agency action.  Id. (quoting Port of Seattle v. Pollution Control Hr'gs Bd., 151 Wn.2d 568, 588, 90 P.3d 659

6

(2004) (internal quotation marks omitted)). Unchallenged findings are verities on appeal. Tapper, 122 Wn.2d at 407.

## A.    Standard of Proof

We conclude that the reviewing officer did not err in applying the preponderance of the evidence standard and did not thereby violate due process, as Sweeney alleges.

### 1.    Law

"Whether an agency order, or the statute supporting the order, violates constitutional provisions is a question of law and '[w]e review issues of law de novo.'" Hardee v. Wash. State Dep't of Soc. & Health Servs., 172 Wn.2d 1, 7, 256 P.3d 339 (2011) (quoting Thurston County v. W. Wash. Growth Mgmt. Hr'gs Bd., 164 Wn.2d 329, 341, 190 P.3d 38 (2008)).

"A professional license is a property interest for which revocation requires due process." Hardee, 172 Wn.2d at 8-9. The fundamental requirement of due process is the opportunity to be heard "at a meaningful time and in a meaningful manner." Mathews v. Eldridge, 424 U.S. 319, 333, 96 S. Ct. 893, 47 L. Ed. 2d 18 (1976) (quoting Armstrong v. Manzo, 380 U.S. 545, 552, 85 S. Ct. 1187, 14 L. Ed. 2d 62 (1965)), abrogated on other grounds. Accordingly, the United States Supreme Court has "consistently [] held that some form of hearing is required before an individual is finally deprived of a property interest." Mathews, 424 U.S. at 333.

Washington state courts apply the three-part test from Mathews to determine whether the legislative standards for an adjudicative proceeding satisfy constitutional due process requirements. Hardee, 172 Wn.2d at 10. Namely Mathews requires this court to examine: (1) the private interest that will be affected by the official action; (2) "the risk

of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards"; and (3) the government's interest, including the function and fiscal and administrative burdens of additional procedural requirements. Mathews, 424 U.S. at 335; Hardee, 172 Wn.2d at 10.

Our Supreme Court has held that certain licenses, such as that of a physician, require clear and convincing evidence before revocation. Hardee, 172 Wn.2d at 8-9 (citing Bang D. Nguyen v. Dep't of Health Med. Quality Assurance Comm'n, 144 Wn.2d 516, 518, 29 P.3d 689 (2001)). However, it has also held that not all occupations require the same "personal investment" and not all state-granted credentials constitute a "professional" license. Id. at 9. And the appellate courts, thus, rightly have applied a preponderance of the evidence standard to many types of occupational licensing revocations, such as real estate agents, adult-home caregivers, among others. Id.

Neither party assigned error to the findings of fact by the ALJ as to the nature and functions of an insurance producer and, therefore, those findings are verities on appeal, which we do not disturb and refer to below. Tapper, 122 Wn.2d at 407.

2. Discussion

i. Private interest

The first of Mathews's three-part test addresses the nature of Sweeney's private interest in her license. To determine the value of a private interest in one's license, a court must look to objective measures of investment (e.g., time, money, education, etc.) rather than engaging in "the hopeless task of weighing the subjective value each

8

individual places on his or her chosen occupation." Hardee, 172 Wn.2d at 15.

In Hardee, our Supreme Court upheld the revocation of a home childcare license under a preponderance of the evidence standard. Id. at 10. In contrasting the level of investment of a home childcare licensee to that of a physician, the Court reasoned that "[b]ecoming a licensed physician requires a four-year undergraduate degree, a four-year postgraduate degree, and additional years of residency training. Physicians must pass multiple tests and examinations before licensure and maintain continuing educational requirements thereafter." Id. at 13. Further, in assessing the impact of the loss of a license, the court stated that a "physician's license is not limited to a particular location. . . . The physician holds the medical license—not the facility in which the physician administers care. . . . Upon revocation of the license, a physician can no longer engage in the practice of medicine." Hardee, 172 Wn.2d at 13.

Ultimately, the Court held that "a license for a home child care facility is not a personal interest that compels a standard of proof beyond a preponderance of the evidence" because, in pertinent part, a "provider can obtain a license for a home by completing a mere 20 hours of state approved training" and "an individual who wishes to care for children but who lacks the requisite qualifications to obtain a license can still potentially work in the field as a child care staff member." Id. at 10-11.

Similarly, here, obtaining a license to produce insurance requires (1) being at least 18 years old, (2) 20 hours of coursework, (3) passing an exam, and (4) payment of application and appointment fees. RCW 48.17.090(2)(a)-(e); RCW 48.14.010; WAC 284-17-510. While we acknowledge that obtaining a resident insurance producer license is an undertaking in its own right and may provide a valuable service to a community, the

commitment required to do so is objectively different than the investment in a license, e.g., to practice medicine, when looking at the time, course requirements, and cost. Indeed, there is no evidence in this record about what kind of time commitment is necessary to pass the requisite exam. Furthermore, as in Hardee, by the revocation, Sweeney was not barred from the insurance industry as a whole because there are other jobs within the insurance agency she can still do without this specific license. RCW 48.17.062(2)(a).

Thus, on all "objective" measures, such a license is not a personal interest that compels a standard of proof beyond a preponderance of the evidence.

Sweeney acknowledges the distinction between, as she describes it, "merely an occupational license rather than a professional license," as laid out in Hardee. Sweeney, however, asks us to look beyond these objective measures and assess the effect on her "livelihood and professional reputation" and the "stigma" the revocation created, citing Nguyen, 144 Wn.2d at 527. Further, she avers that "to the extent the proceeding is considered quasi criminal as to professional licensure, the lowest standard of proof should not be applied."

Indeed, our Supreme Court in Nguyen reiterated that a "loss of a professional license is more than a monetary loss; it is a loss of a person's livelihood and loss of a reputation." Nguyen, 144 Wn.2d at 527 (quoting Johnson v. Bd. of Governors, 1996 OK 41, 1346, 913 P.2d 1339 (1996)). However, the predicate fact is that it is the loss of *professional* license, which per the objective measures above, a license to become an insurance producer is not, again, in part because the revocation does not "destroy[] his

or her ability to practice" in that field. Id.

Furthermore, it is true that "a higher level of certainty [is] 'necessary to preserve fundamental fairness in a variety of government-initiated proceedings that threaten the individual involved with a significant deprivation of liberty or stigma.'" Id. at 528 (quoting Santosky v. Kramer, 455 U.S. 745, 756, 102 S. Ct. 1388, 1396, 71 L. Ed. 2d 599 (1982)). However, there is no evidence in this record that there is a "significant" or even possible deprivation of liberty or any significant stigma attached to this revocation, other than Sweeney's bare assertions in her briefing.

Finally, the proceedings before the OIC were nothing like the medical disciplinary proceedings described in Nguyen which were "indeed quasicriminal," "unique," "not strictly adversarial," and "unavoidably punitive." Id. Here, Sweeney was represented by counsel, had full use of discovery procedures, could and bring witnesses, etc., as will be described more fully below.

Therefore, although Sweeney does hold a private interest in her occupational license, her objective investment in this particular licensure is not comparable to that of a physician as in Nguyen, so it does not warrant the higher burden of proof for its revocation.

    ii.   Risk of erroneous result

As to the second Mathews factor, OIC's investigative and adjudicative process has several steps that are likely to reduce the risk of an erroneous deprivation. First, OIC's Regulatory Investigations Unit investigates alleged wrongdoing. Second, if the OIC decides to suspend, revoke or refuse to renew a license, it must issue a written order with strict notice and timing requirements. RCW 48.17.540(2)-(3). Further, the license holder has the right to challenge such a decision in a hearing before the hearing unit and an ALJ,

which may include written advocacy, oral argument, and the presentation of witnesses. Id.; RCW 48.04.010(2), (5); RCW 34.05.446(3); RCW 34.05.449(2). Throughout the process, the license holder may be represented by legal counsel. WAC 10-08-083.

Furthermore, much like a civil legal proceeding, each party may serve interrogatories; request and depose witnesses; issue subpoenas; and cross-examine witnesses. Former WAC 284-02-070(e)(2021)[6]; RCW 34.05.446; RCW 34.05.449; WAC 10-08-120.

Should the ALJ uphold the original order, the reviewing officer then reviews the ALJ's decision, may take written argument from the parties, including objection to any of the findings from the ALJ, and issues a final written order. WAC 284-02-070(2)(d)(i); RCW 34.05.464. After that, if the license holder is dissatisfied, they may petition for reconsideration or seek judicial review. RCW 34.05.470; RCW 34.05.510-98.

Believing there is a conflict or "gap" in our Supreme Court's precedents, Sweeney asks this court, first, not to follow Hardee's holding, 172 Wn.2d at 11, that processes such as those described above minimize the risk of an erroneous revocation, unless the revokee can show that such processes "suffer from inadequacies that make erroneous deprivations readily foreseeable." Sweeney argues that a "standard higher than a preponderance of the evidence should *always* apply in administrative hearing matters where private interests are implicated, such as in Ms. Sweeney's case." (emphasis added) (citing Nguyen, 144 Wn.2d at 527).

As a preliminary matter, for the reasons provided above, Sweeney does not have

---

[6] At the time of this hearing, parties did not need the ALJ to grant permission to engage in discovery. See Wash. St. Reg. (WSR) 21-23-079 at 1, 3-4 (December 21, 2021) (Permanent Rules).

the same private interest that Dr. Nguyen had. More importantly, there is no conflict between Hardee and Nguyen because they described different processes; one, in Hardee, which was as adversarial as the one here, and one in Nguyen was not. We, thus, should not and need not decline to apply our Supreme Court's precedent in Hardee, which held that processes such as the one used here adequately minimized the risk of erroneous deprivation.

Sweeney further contends that the risk of erroneous deprivation was further aggravated because the OIC applied an "almost entirely subjective standard of conduct." There is nothing subjective, however, in requiring a client's consent to make changes to their healthcare insurance. That is binary and entirely distinguishable from the standards of conduct considered in Nguyen.

Finally, to the extent that Sweeney may suggest additional procedural safeguards would have helped, "that fact alone does not justify their adoption" because "additional procedural safeguards will always decrease the likelihood of revocation. Hardee, 172 Wn.2d at 11. Sweeney must point to something more which "make[s] erroneous deprivations readily foreseeable." Hardee, 172 Wn.2d at 11. She does no such thing.

In short, Sweeney does not argue that these procedures themselves were so structurally flawed that they risked a result that was error. Rather, she disagreed with a standard of proof that was part of an extensive process that found against her. We conclude that OIC's process weighs in favor of applying the preponderance standard.

        iii.  Governmental interest

As to the third and final Mathews factor, the State has a significant interest in protecting elderly and low-income health care consumers from insurance fraud. For this

reason, the legislature sets a high standard of conduct to obtain and retain an insurance producer license, requiring trustworthy behavior and acting in good faith in all insurance matters. RCW 48.01.030. Our Supreme Court has explained that "[s]tatutory aims and objectives serve as strong independent evidence of a public good's value." Hardee, 172 Wn.2d at 12.

Here, Sweeney's clients, dual eligible Medicare beneficiaries, were elderly or disabled individuals with limited financial resources. Furthermore, they were often members of Chinese immigrant communities, who were limited English-language proficient and some of whom (as Sweeney asserted) may have been skeptical of the government. These clients relied upon Sweeney to help them navigate complex bureaucratic systems and also everyday tasks such as scheduling appointments. Sweeney exercised a position of significant trust, sometimes as the only contact available to help each client access and understand their health care.

As with Hardee, it is vital to ensure that the OIC can effectively investigate and regulate insurance providers to fulfil its obligation to insurance consumers. Whether or not a more stringent review is warranted, Sweeney did not demonstrate that the current process was deficient such that it outweighed the government's significant interest in ensuring that vulnerable seniors were provided insurance with good faith.

In applying all of the above factors from Mathews, the we conclude that the reviewing officer did not err in applying the preponderance of the evidence standard.

**B.    Hearsay and Substantial Evidence**

We conclude that the reviewing officer did not err in relying partially on hearsay evidence and, in doing so, did not err in finding there was substantial evidence sufficient to revoke Sweeney's license.

1. Law

In an administrative hearing, "[f]indings of fact shall be based exclusively on the evidence of the record in the adjudicative proceeding . . . [and] [f]indings shall be based on the kind of evidence on which reasonably prudent persons are accustomed to rely in the conduct of their affairs." RCW 34.05.461(4). "However, the presiding officer shall not base a finding *exclusively* on evidence" that would be inadmissible in a civil trial "*unless* the presiding officer determines that doing so would not unduly abridge the parties' opportunities to confront witnesses and rebut evidence." Id. (emphasis added).

Moreover, hearsay evidence may be admissible under certain circumstances in administrative proceedings. RCW 34.05.452(1). Namely, the APA permits the admission of "hearsay evidence . . . if in the judgment of the presiding officer it is the kind of evidence on which reasonably prudent persons are accustomed to rely in the conduct of their affairs." Id. Again, the ALJ cannot rely upon it exclusively. RCW 34.05.461(4). But, if the ALJ does exclusively rely on hearsay, the order must include the basis for determining that the parties were not prevented from confronting witnesses or rebutting evidence. Id.

Substantial evidence requires court to look at evidence "in the light most favorable to the party who prevailed in the highest forum that exercised fact-finding authority." Freeburg v. City of Seattle, 71 Wn. App. 367, 371-72, 859 P.2d 610 (1993) (quoting State ex rel. Lige & Wm. B. Dickson Co. v. County of Pierce, 65 Wn. App. 614, 619, 829 P.2d

217 (1992), superseded by statute on other grounds).

We conclude that the reviewing officer did not err because (1) the ALJ did not rely solely upon hearsay and, thus, did not need to reach whether Sweeney's ability to confront witnesses against her was unduly abridged; (2) ample evidence indeed supported the ALJ's findings.

2. Discussion

i. Hearsay

Sweeney contends that the declarations against her were hearsay which would be inadmissible in ordinary civil proceedings. That is true, but the question here is whether it is the "kind of evidence on which reasonably prudent persons are accustomed to rely in the conduct of their affairs." RCW 34.05.452(1). Sweeney offers no argument or authority that reasonable persons do not rely on declarations in their ordinary affairs. Where a party fails to provide citation to support a legal argument, we assume counsel, like the court, has found none. State v. Loos, 14 Wn. App. 2d 748, 758, 473 P.3d 1229 (2020) (citing State v. Arredondo, 188 Wn.2d 244, 262, 394 P.3d 348 (2017)). It is simply not true that the presence of hearsay dooms the validity of such a process.

Sweeney next argues that she was unable to confront any declarants who did not appear for the hearing and, thus, her opportunity to do so was "unduly abridged," making implicit reference to RCW 34.05.461(4). In her reply, Sweeney further argues that it was not her burden to produce witnesses, that none of the consumers she enrolled testified, and neither did the primary investigator who spoke to them.

The plain language of the statute requires the presiding officer to determine Sweeney's opportunities to confront witnesses and rebut evidence were not unduly

16

abridged *only if* the officer is relying *exclusively* on inadmissible evidence. RCW 34.05.461. Here, the findings of fact the ALJ noted, were based not just on, e.g., Robbins's testimony or the declarations, but also multiple exhibits offered by OIC. While these exhibits included a declaration from Bariekman and from consumers who stated they did not consent to re-enrollment, there was abundant additional evidence and testimony offered, including live witnesses, uncontested data, and more. In short, the presiding officer, here the ALJ, did not need to make the determinations regarding Sweeney's opportunity to confront witnesses because the ALJ's finding was not based solely on hearsay.

ii. Substantial evidence

More broadly, Sweeney claims that "[s]ubstantial evidence does not support the final order." We disagree. The record amply supports the findings the reviewing officer adopted.

First, the findings of fact regarding Sweeney's license history, process for signing clients up for UH Dual Complete, and her subsequent disenrollment and re-enrollment of clients were based almost entirely on Sweeney's own testimony.

Next, the findings of fact credited DuCharme, who gave extensive testimony about how the LEAN program (which housed UH's enrollments) worked, and about Sweeney's enrollments from 2019. DuCharme explained that it was not technologically possible for Sweeney to collect the signatures for disenrollment and reenrollment as far in advance of the March 2019 mass-enrollment as she claimed she could, because the LEAN program would not allow it. Additionally, he noted that in all cases, Sweeney selected the option to send all confirmations of enrollments to herself instead of to the consumers, which was

unusual.

Additionally, OIC and UH's own administrators and investigators, Nevells and Gelemeev, respectively, testified as to the steps they took to assess Sweeney's actions. The OIC reviewed these steps and the declarations they generated from clients who attested they never met with Sweeney or consented to dis-enrollment or re-enrollment.

Finally, the OIC was presented with documentary evidence of Sweeney's 133 re-enrollments, which included the names of consumers, contact information (listed as Sweeney's), and the time stamp for when she enrolled them in a 15-hour period.

Sweeney had the opportunity to bring evidence and witnesses to rebut this testimony. She brought only a colleague without personal knowledge of the events to testify to her character in general. Sweeney called none of the 129 living consumers she re-enrolled.

Ultimately, ALJ Martin, and later the reviewing officer who adopted his findings, found the OIC and UH's witnesses more credible than Sweeney.

Therefore, we conclude reviewing officer did not rely entirely on inadmissible evidence, nullifying the need to show no undue abridgement of Sweeney's opportunities to confront evidence against her, and the final decision was supported by substantial evidence.

## C.   Arbitrary and Capricious Sanction

Sweeney argues that the reviewing officer erred by revoking her license because such a harsh sanction was arbitrary and capricious.

An "arbitrary and capricious" agency action, for purposes of RCW 34.05.570(3)(i), is a "willful and unreasoning action, taken without regard to or consideration of the facts

and circumstances surrounding the action. Where there is room for two opinions, an action taken after due consideration is not arbitrary and capricious even though a reviewing court may believe it to be erroneous." City of Redmond v. Cent. Puget Sound Growth Mgmt. Hearings Bd., 136 Wn.2d 38, 46-47, 959 P.2d 1091 (1998).

"The 'harshness' of an agency's sanction is not the test for arbitrary and capricious action." Cummings v. Wash. State Dep't of Licensing, 189 Wn. App. 1, 26, 355 P.3d 1155 (2015). "Agencies 'need not fashion identical remedies', and the courts may 'not enter the allowable area of [agency] discretion.'" Brown v. State Dep't of Health, Dental Disciplinary Bd., 94 Wn. App. 7, 17, 972 P.2d 101 (1998) (quoting Shanlian v. Faulk, 68 Wn. App. 320, 328, 843 P.2d 535 (1992) (alteration in original)). In short, neither the harshness, nor the similarity of a sanction to that issued in another case, are grounds to find a penalty arbitrary and capricious.

Moreover, "An agency's determination of sanctions should be accorded considerable judicial deference as it is peculiarly a matter of administrative competence." Cummings, 189 Wn. App. at 26 (quoting Brown, 94 Wn. App. at 16). "'[T]he scope of review of an order alleged to be arbitrary or capricious is narrow, and the challenger carries a heavy burden.'" Brown, 94 Wn. App. at 16 (quoting Keene v. Bd. of Accountancy, 77 Wn. App. 849, 859, 894 P.2d 582 (1995)).

Sweeney did not offer evidence to show the agency intentionally acted willfully or in the absence of the abundant facts reviewed above in revoking her license. Instead, she focused on the harshness and alleged inconsistency in the penalty. It is irrelevant whether, in other cases regarding insurance fraud provided by the petitioner, other appellants faced different penalties because the OIC is not bound by how it has

19

sanctioned other licensees. <u>Cummings</u>, 189 Wn. App. at 26. Therefore, in granting the deference due, we conclude the revocation was neither arbitrary nor capricious.

**D.** **Polygraph examination**

In administrative hearings, "The presiding officer shall exclude evidence that is excludable on constitutional or statutory grounds or on the basis of evidentiary privilege recognized in the courts of this state. The presiding officer may exclude evidence that is irrelevant, immaterial, or unduly repetitious." RCW 34.05.452(1).

Sweeney sought to have her two-question polygraph admitted, which consisted entirely of the following:

> 1) Were you untruthful when you answered Jamie Bariekmans [sic.] questions?
>
> Ms. Sweeney answered "no".
>
> 2) Were you untruthful about your insurance work with your attorney Jessica Creager?
>
> Ms. Sweeney answered "no".

Washington courts have held that, because polygraph reports are not recognized as reliable evidence, they are not admissible absent stipulation from both parties in attorney discipline matters. <u>In re Disciplinary Proc. Against Kronenberg</u>, 155 Wn.2d 184, 194, 117 P.3d 1134 (2005). There was no such stipulation here and, thus, her polygraph was not admissible.

Even if, as Sweeney concedes in her reply, the presiding officer had the discretion to admit or exclude the polygraph, ALJ Martin made no error in excluding it as duplicative of Sweeney's testimony under ER 403. Sweeney had already testified about her

recollection of the events in terms not dissimilar to examination.

Therefore, we conclude the hearing examiner did not err in excluding it.

### III.    CONCLUSION

We affirm the final order.

Díaz, J.

WE CONCUR:

Birk, J.                          Coburn, J.